**Frank Ray CHANDLER, Petitioner,**

v.

**James B. FRENCH, Warden of Central Prison, Respondent.**

**No. 1:99 CV 00668.**

United States District Court, M.D. North Carolina.

March 3, 2003.

---

J. Clark Fischer, Randolph and Fischer, S. Mark Rabil, Winston–Salem, NC, for Petitioner.

Valerie B. Spalding, N.C. Department of Justice, Raleigh, NC, for Respondent.

## MEMORANDUM OPINION

TILLEY, Chief Judge.

This matter is now before the Court on Frank Ray Chandler's Petition for Habeas

Corpus under 28 U.S.C. § 2254. In a thorough and carefully reasoned opinion, the United States Magistrate Judge recommended that the petition be denied. Petitioner has objected to the Recommendation on several grounds and this opinion addresses those issues. For the reasons set forth below, the Recommendations of the Magistrate Judge are ADOPTED, and the Petition is DENIED.

## I.

The facts, as stated by the North Carolina Supreme Court and to which there is no present dispute, are as follows:

This case arises out of the death of Doris Poore, a ninety-year-old widow who was killed during a burglary of her home on 11 December 1992. Defendant was indicted for first-degree murder, first-degree burglary, attempted larceny, attempted first-degree rape, and attempted first-degree sexual offense. He was tried before a jury, which found him guilty of the first-degree murder of Doris Poore under the felony murder rule, with first degree burglary as the underlying felony. The jury also found him guilty of attempted larceny, but not guilty of attempted first-degree rape or first-degree sexual offense. After a separate capital sentencing proceeding, the jury recommended and the trial court imposed a sentence of death for the first-degree murder conviction and a three-year prison sentence for the attempted larceny conviction.

The State presented evidence at trial tending to show that on 10 December 1992, Mrs. Poore talked by telephone with Grace Vaughn, a friend, until approximately 10:30 p.m. The next day at 8:00 a.m., Lea Quiros, the victim's housekeeper, arrived at Mrs. Poore's house and knocked on the front door. When Mrs. Poore did not answer the door, Mrs. Quiros attempted to call her on the telephone. Again, no one answered. Mrs. Quiros contacted Mr. Jack Leach, Mrs. Poore's son-in-law, who, on arrival, entered the house by the back door. Mr. Leach let Mrs. Quiros in the house. Mr. Leach found Mrs. Poore dead in her bed in a pool of blood.

Special Agent R.D. Melton of the SBI testified that during the investigation of Mrs. Poore's death, he observed that the screen door at the back of her house had been cut with two "L"-shaped cuts above the center support strut on the right side of the door where a latch was located. The screen was slightly pushed in. The wooden door was open, and the screws from the chain lock were pulled from the wall and left hanging on the door.

After entering Mrs. Poore's house, Melton found Mrs. Poore's glasses and hearing aids on the dining room table. Upon entering Mrs. Poore's bedroom, he found bed clothing on the bed, a sheet pulled up over the victim, and an area of pooled blood underneath her head. The victim was lying on the bed with her pajama top open and her body was nude from the waist down; smeared bloody fingerprints were on her abdomen. A pair of pajama bottoms and a pair of panties were wadded together at the foot of the bed between the victim's legs, but slightly beneath her right foot. He also noted that an electric heating pad was on the bed.

Dr. Gregory James Davis, a forensic pathologist, testified that Mrs. Poore died from a single "massive blow" to the head. The blow resulted in a hinge fracture to the scalp, which effectively caused the skull to snap in two resulting in extensive swelling and hemorrhaging of the brain. Mrs. Poore had numerous abrasions, lacerations, and bruises.

Special Agent Ricky Navarro, a latent evidence specialist with the SBI, testified that palm and fingerprints matching the defendant's were found on the wooden door leading into the kitchen. Special Agent J.L. Eddins testified that after he took defendant's fingerprints, he asked defendant to sign a consent to search form. Defendant signed the fingerprint card, but refused to sign the other related documents. After defendant asked to make a phone call, he proceeded to destroy all of the documents and the card.

Jeffrey Kyle Wilson, defendant's cellmate from January 1993 until April 1993, testified that while defendant was in jail, defendant asked him what he should do. Wilson told him to tell the truth so that he would not get the electric chair. Wilson said that defendant replied that "they" did not have the evidence to convict him. Then, defendant described how he had committed the murder and that as a defense, he planned to "play crazy."

Defendant took the stand as the only defense witness and testified that he left his aunt's house between midnight and 12:30 a.m. on 11 December 1992 and walked to the victim's house. After knocking on the window, back door, and garage door, and not getting an answer, he entered the house through the unlocked basement door. He proceeded up the stairs, cut the screen door with a pocketknife, and opened the back door leading to the kitchen. He testified that as he started to walk through the house, he saw something out of the corner of his eye. When he started to leave, somebody behind him screamed. He then turned and swung, making the victim fall against him. He testified that as Mrs. Poore was falling, he caught her; he then carried her to her bed, put her in the bed, and went to the bath-

room to wash the blood off his hand. He saw Mrs. Poore's clothes at the front of the toilet, picked them up, put them next to her in her bed, and covered her up.

Defendant testified that he had not known who lived in the house, but thought that a man lived there because he had seen a blue pickup truck parked in front of the house before and had seen a man smoking "reefer" or marijuana there. Defendant testified that after he left the house, he washed his clothes and that he still had them. On cross-examination, defendant testified that after he killed Mrs. Poore, he did not look for the marijuana as he had originally planned. *State v. Chandler,* 342 N.C. 742, 747–50, 467 S.E.2d at 639–41

Petitioner was indicted on March 8, 1993 for first degree murder, first degree burglary, attempted larceny, attempted first degree rape, and attempted first degree sexual offense. Petitioner was tried in Surry County and, on July 16, 1993, was convicted of first degree burglary, attempted larceny and first degree murder under the felony murder rule, with first degree burglary as the underlying felony. He was found not guilty of the attempted rape and attempted sexual offense charges in the indictment.

At the sentencing phase, the jury found pecuniary gain to be the sole aggravating factor. It found three mitigating factors: (1) Petitioner's lack of proper parental role models during his formative years; (2) his history of alcohol and drug abuse; and (3) his acknowledgment that he had killed Mrs. Poore. The jury recommended that Petitioner be sentenced to death.

The North Carolina Supreme Court affirmed Petitioner's conviction and sentence on March 8, 1996. *State v. Chandler,* 342

N.C. 742, 467 S.E.2d 636 (1996). The United States Supreme Court denied certiorari on October 7, 1996. *Chandler v. North Carolina*, 519 U.S. 875, 117 S.Ct. 196, 136 L.Ed.2d 133 (1996).

Petitioner filed a Motion for Appropriate Relief, which was heard in the Surry County Superior Court on April 6 and April 9, 1998. The Honorable William Freeman denied the Motion for Appropriate Relief on October 14, 1998. ("MAR court"). The North Carolina Supreme Court denied certiorari to review Judge Freeman's ruling on the Motion for Appropriate Relief on July 23, 1999. *State v. Chandler*, 350 N.C. 838, 538 S.E.2d 572 (1999).

A Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 was filed in the United States District Court for the Middle District of North Carolina on October 20, 1999. The Magistrate Judge reviewed the Petition for Habeas Corpus and made the following recommendations on June 12, 2001:(1) the prosecution did not fail to disclose impeachment evidence in violation of *Brady v. Maryland;* (2) the prosecution did not present perjured testimony in violation of *Giglio v. United States;* (3) Petitioner's Sixth Amendment right to effective assistance of counsel was not violated due to a conflict of interest; and (4) the jury instructions regarding mitigating circumstances and the definition of mitigation were not erroneous. Petitioner filed Objections to the Magistrate Judge's Recommendations on July 16, 2001. Each of these objections will be addressed separately.

## II.

Petitioner first contends that the Magistrate Judge (1) failed to consider the importance of Jeffrey Kyle Wilson's testimony at trial and (2) applied an improper standard of review. Neither objection has merit.

## A.

■ As to the first, Petitioner asserts he would not have received the death penalty had Wilson not testified that Petitioner wanted to see the private parts of an old woman. Essentially, Petitioner's argument is that the jury sentenced him to death because they believed Wilson's testimony and thought Petitioner should be sentenced to death because of the perverse nature of the crime. In the first place, there is nothing to indicate that the jury did give weight to Wilson's testimony in reaching its decision or that it concluded Petitioner should receive the death penalty because of a perverse nature. Wilson's credibility was effectively impeached on cross examination: he admitted to a multitude of crimes involving misrepresentation and contradicted himself within moments about whether Petitioner had said he burned some of the clothing worn during the murder or threw the clothes into a landfill. Wilson even denied having just testified before the jury to any burning at all.

Even if it should be assumed that the jury did find that Petitioner had acted perversely, Wilson's testimony would not have been necessary to the finding. It is far more likely that the jury's view of Petitioner was affected by the obvious ferocity of the fatal blow, the nature of the crime scene, and Petitioner's own improbable version of the events. The forensic pathologist testified that Mrs. Poore died from a single massive blow to the head which effectively caused the skull to snap in two. Blood was pooled underneath her head in the bed. There were about four drops of blood next to the bed and, other than in the bed, nowhere else in the bedroom. Petitioner had testified that after

entering the dark house, while in what later was identified as the dining room, he was surprised by screams, turned and swung his arm, striking Mrs. Poore partially with his forearm and partially with his hand. He testified that she had fallen into him and that he had caught her before she hit the floor and, then, carried her into the bedroom and placed her in the bed. (Trial tran. Vol. V., p. 695, line 7 through p. 696, line 8; Vol. V., p. 714, lines 13–15; Vol. V. p. 709, line 18 through p. 713, line 22).

In rebuttal, the forensic pathologist testified that the blow to Mrs. Poore's head was so severe as to have caused immediate bleeding when delivered. Yet, no blood was found in the dining room where Petitioner claimed the blow was delivered.

Smeared bloody fingerprints were on Mrs. Poore's abdomen. Her pajama top was open and the pajama bottoms and her panties were wadded at the foot of the bed, slightly under her right foot.

Considering these circumstances, the jury had every reason to disbelieve Petitioner's version of where and how the blow had been struck as well as his testimony of finding the pajama bottoms and panties in the bathroom, placing them in the bed with Mrs Poore and, then, covering her with a sheet. Mr. Wilson's testimony about Petitioner's having said he wanted to see what an old lady looked like added little but a facet of corroboration to a crime scene that largely explained itself.

### B.

Petitioner's second contention is that the Magistrate Judge applied an improper standard of review. The Magistrate Judge explained the standard of review as follows: Title 18 U.S.C. § 2254 provides that a federal court cannot grant habeas corpus relief to a person in state custody on any claim that was "adjudicated on the merits" in a state court proceeding unless the adjudication either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (West.Supp.2002). A state court decision is contrary to Supreme Court precedent if it reaches a "conclusion opposite to that reached by the Court on a question of law" or if the state court "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and reaches the opposite result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Furthermore, a state court decision "involves an unreasonable application of Supreme Court law if the state court 'identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'" *Id.* at 407, 120 S.Ct. 1495.

In addition, if the state court has made factual findings on the merits, those findings are entitled to a presumption of correctness, which can only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Thus, the federal habeas court reviews substantive findings of the state court with a highly deferential standard of review. If, on the other hand, the state court decision was based on procedural grounds or if the state court did not consider the substantive merits of the claim, then those issues are subject to *de novo* review. *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir.2001) (holding *de novo* review, rather than AEDPA deference, appropriate when the district court is unable to determine what the state court decided on a particular issue). The Magistrate

Judge correctly defined and applied the standard of review applicable to Petitioner's claims. Petitioner's objection on this basis is without merit.

## III.

Petitioner asserts that the prosecution allowed Jeffrey Kyle Wilson, a state witness, to testify falsely in violation of *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Specifically, Petitioner claims that the state knowingly presented false testimony by allowing Wilson to testify that he was not receiving and did not seek any favorable treatment for his testimony. At trial, Wilson testified that he had not made any deals for his testimony (Trial tran. Vol. V, p. 608, lines 16–20) and that he was only testifying because he wanted to "make sure this never happens again." (Trial tran. Vol. V, p. 611, lines 4–18). Petitioner asserted that Wilson's testimony that his motive for testifying was that he wanted to "make sure this never happens again" was false testimony for three reasons: (1) when Wilson first approached law enforcement officers with information, he asked, "What's in it for me?"; (2) Wilson hoped to receive sentencing concessions for pending charges in Surry County; (3) Wilson hoped to receive reward money for his testimony; and (4) Wilson hoped to receive assistance with his parole revocation hearing. In considering each of these issues, the Magistrate Judge properly deferred to the factual findings of the MAR court[1], addressed each of Petitioner's *Giglio*

claims, and recommended that each claim be dismissed.

■ First, Petitioner asserted that prosecutors knowingly allowed Wilson to testify falsely regarding his motives because at his initial meeting with police officers on February 1,1993 Wilson asked "What's in it for me?" Petitioner asserted that this statement was a request by Wilson for sentencing concessions with respect to felony charges Wilson had pending in Surry County. At the February 1 meeting, Special Agent Ron Perry of the State Bureau of Investigation and Captain Gray Shelton of the Mt. Airy Police Department told Wilson that they could not offer him anything in exchange for his testimony, and Wilson did not ask for assistance again.

In considering the "What's in it for me?" statement, the Magistrate Judge correctly noted that this statement was open to several interpretations and that because of this ambiguity it did not establish false testimony. (Rec. of United States Magistrate Judge at 9). Petitioner's *Giglio* challenge to Wilson's statement is dismissed.

■ Second, Petitioner asserted that *Giglio* was violated because the state knowingly presented false testimony by allowing Wilson to testify that he had not "brung up" his charges in hopes of receiving concessions in exchange for his testimony. As noted above, Wilson initially met with Special Agent Perry and Captain Shelton on February 1, 1993. The reports

1. With respect to each of these items, the MAR court found that *Giglio* was not violated because Wilson testified truthfully that he had made no deals with the prosecution in exchange for his testimony. The MAR court found that "since no agreement existed, implied or express, the State did not present perjured testimony through Wilson when he testified that he had not brought up his pending charges in expectation of a sentencing

concession. *Giglio* does not apply to defendant's claim." (Mot. Appropriate Relief Mem. Op. Final Order at 24–25, ¶ 27). Petitioner asserts that the MAR court misapplied *Giglio* by focusing only on whether Wilson had made an agreement with prosecutors in exchange for his testimony rather than considering whether Wilson testified falsely about his motives.

the officers filed following this meeting contained a list of the charges pending against Wilson at the time of the interview. Petitioner argued that this list of charges is evidence that Wilson brought up his charges with the officers in hopes of receiving a sentencing concession and, thus, that Wilson's testimony that he had never "brung up his charges" constitutes false testimony.

At the hearing on the Motion for Appropriate Relief, Special Agent Perry testified that the listing of Wilson's pending charges in his report was a response to a question the officers asked Wilson regarding why he was in jail. (Mot. Appropriate Relief Mem. Op. Final Order at 21, ¶ 9). The MAR court made a factual finding that Wilson did not initiate the discussion of his pending charges. (Mot. Appropriate Relief Mem. Op. Final Order at 24, ¶ 22).

The Magistrate Judge correctly applied the highly deferential standard of review required by 28 U.S.C. § 2254. Petitioner has not presented clear and convincing evidence to rebut the MAR court's factual finding that Wilson did not initiate a conversation with officers regarding his pending charges. The Magistrate Judge correctly conclude that Wilson's response to questioning by officers "does not show that Wilson testified falsely that he had not 'brung up' his charges in relation to the information he gave officers." (Rec. of United States Magistrate Judge at 8). Petitioner's *Giglio* claim on this issue is dismissed.

■ Third, Petitioner initially asserts that the prosecutors knowingly presented false testimony when Wilson testified about his motives because Wilson expected to receive reward money in exchange for his testimony. Petitioner asserts that Wilson expected to receive reward money that was offered by the Governor's office ($5000) and the Crime Stoppers organiza-

tion ($1000) for information regarding Mrs. Poore's murder. After Petitioner's trial, Wilson received a $2500 check from the Governor's reward fund, which he signed over to his mother.

At trial, there was no testimony regarding a reward. At the Motion for Appropriate Relief hearing, Wilson testified that he had hoped for some reward money. (Mot. Appropriate Relief Mem. Op. Final Order at 20, ¶ 4). However, Captain Shelton, who was present for all interviews of Wilson, testified at the MAR hearing that he never heard Wilson mention reward money. (Mot. Appropriate Relief Mem. Op. Final Order at 22, ¶ 12). District Attorney Dellinger testified at the MAR Hearing that he could not recall Wilson asking about the reward in any discussions prior to trial. (Mot. Appropriate Relief Mem. Op. Final Order at 23, ¶ 20). The MAR court made a factual finding that the prosecutors did not discuss the possibility of a reward with Wilson. (Mot. Appropriate Relief Mem. Op. Final Order at 23, ¶ 17).

Based on these factual findings of the MAR court, which Petitioner has not rebutted with any clear and convincing evidence, the Magistrate Judge observed that while Wilson hoped he would receive some reward money, he had not discussed the possibility of reward money with the investigating officers or with the prosecutors prior to trial. (Rec. of United States Magistrate Judge at 7). Because neither the prosecutors nor the investigating officers were aware that Wilson hoped to receive reward money, the state did not knowingly present false testimony on the issue of a reward at trial. Petitioner's *Giglio* claim on this issue is dismissed.

■ Fourth, Petitioner argues that Wilson testified falsely about his motives with respect to whether he expected to receive assistance at his parole revocation hearing.

At trial, Wilson admitted on cross examination that he thought Special Agent Perry's attendance at his parole revocation hearing would help him. (Trial Tr. Vol. V, at 622–23). Because Wilson admitted, rather than denied, that he thought he might benefit from Special Agent Perry's attendance at the parole revocation hearing, the prosecutors did not present false testimony with respect to Wilson's expectation of assistance. Petitioner's *Giglio* claim on this issue is dismissed.

### IV.

■ Petitioner also argues that the state violated his constitutional rights by withholding evidence that should have been disclosed during discovery pursuant to *Brady v. Maryland* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In his objections to the Recommendations of the Magistrate Judge, Petitioner asserts that the Magistrate Judge erroneously applied the wrong standard of review to Petitioner's *Brady* claims. Specifically, Petitioner asserts that his *Brady* claims were not "adjudicated on the merits" by the MAR court, and thus, that the Magistrate should have conducted a *de novo* review of Petitioner's *Brady* claims. The MAR court did not specifically address the question of whether each piece of non-disclosed evidence should have been disclosed under *Brady*, and Petitioner is correct that the *Brady* issue should receive *de novo* review on those issues the MAR court did not address. Despite Petitioner's contention that the Magistrate Judge deferred to the findings of the MAR court on all of the *Brady* claims, the Magistrate Judge correctly identified and applied the following standard in conducting a *de novo* review of Petitioner's *Brady* claims that the MAR court did not address:

> To establish a *Brady* violation, petitioner must show that evidence favor-

able to him was suppressed by the prosecution and that the evidence was material either to his guilt or punishment. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Evidence is material if there is a reasonable probability that its disclosure would have changed the result of the trial. *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). There is a "reasonable probability" of a different result if, in the absence of the evidence, petitioner received a fair trial which is understood as a trial resulting in a verdict worthy of confidence. *See Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

(Rec. of United States Magistrate Judge at 4).

### A.

■ Petitioner's first *Brady* argument involved the "What's in it for me?" question asked by Jeffrey Kyle Wilson at his initial meeting with police officers on February 1, 1983. This question was not disclosed to Petitioner, and Petitioner asserted that this nondisclosure constitutes a *Brady* violation.

The Magistrate Judge correctly recommended a finding that the prosecution's failure to disclose this statement did not violate *Brady* because when considered in conjunction with all of Wilson's testimony at trial, this isolated statement "was of very limited impeachment value." (Rec. of United States Magistrate Judge at 7). The Magistrate Judge's recommendation was based on ample evidence in the trial transcript that Wilson's credibility was effectively challenged without this statement. For example, Petitioner's trial counsel extensively questioned Wilson about his expectations for his testimony and successfully elicited testimony from Wilson that he hoped to receive help in his

parole revocation hearing. (Trial Tr. Vol. V, at 622–23). Furthermore, Wilson's lengthy criminal history and drug addiction were also brought to the jury's attention at trial. Petitioner's *Brady* challenge to the "What's in it for me?" statement is dismissed.

## B.

■ Second, Petitioner objects to the Magistrate Judge's Recommendation that the prosecution did not violate *Brady* by failing to disclose police reports prepared by Special Agent Perry and Captain Shelton following their initial interview with Wilson on February 1, 1983. These reports contained a listing of the charges pending against Wilson. Petitioner asserts that these reports should have been disclosed because the listing of Wilson's pending charges constitutes evidence that Wilson sought assistance with these charges in exchange for his testimony.

Although the MAR court did not specifically address whether the nondisclosure of these reports constituted a *Brady* violation, the MAR court did make a factual finding that the listing of the charges in the report was not the result of a conversation initiated by Wilson but was a response to questioning by officers. This factual finding is entitled to a presumption of correctness unless Petitioner rebuts this finding with clear and convincing evidence; Petitioner has not made the showing necessary to rebut the presumption. As the Magistrate Judge noted in his recommendations, the factual finding that Wilson did not initiate the conversation regarding his pending charges "robs petitioner's argument of any force. The statement would not have been impeaching, and thus there was no *Brady* violation." (Rec. of United States Magistrate Judge at 8).

The Magistrate Judge also noted that the information regarding Wilson's pending charges that was contained in the report was disclosed through testimony at trial. (Rec. of United States Magistrate Judge at 8). Special Agent Perry testified at trial that Wilson told him "what he was in jail for." (Trial Tr. Vol. IV, at 597). The Magistrate Judge correctly concluded that *Brady* was not violated because the *Brady* rule "does not apply if the evidence in question is available to the defendant from other sources." *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir.1990). Petitioner's *Brady* challenge to the police reports is dismissed.

## C.

■ Third, Petitioner objects to the Magistrate Judge's finding that the state did not violate *Brady* when it did not disclose a State Bureau of Investigation report that Special Agent Perry prepared after he attended and testified at Wilson's parole revocation hearing. Petitioner asserts that the report would have shown that Special Agent Perry viewed his attendance at the parole hearing as partial consideration for Wilson's testimony. However, at trial Special Agent Perry testified that he went to Wilson's parole hearing and told the parole board that Wilson had provided the state with valuable information in Petitioner's case. (Trial Tr. Vol. IV, at 591, 597). In addition, Wilson admitted at trial that he thought Special Agent Perry's presence at this parole hearing would be helpful. (Trial Tr. Vol. V, at 628).

Based on this testimony at trial, The Magistrate Judge rejected Petitioner's contention that the failure to disclose the report was a *Brady* violation, and observed that "the written report would not have provided any greater basis for linking Agent Perry's attendance at the hearing to his duties in the murder investigation than the information otherwise provided to the

petitioner." (Rec. of United States Magistrate Judge at 11). Because the information contained in the report was available to Petitioner through trial testimony, there was no *Brady* violation. *See United States v. Wilson,* 901 F.2d 378, 380 (4th Cir.1990).

The Magistrate Judge also rejected Petitioner's argument that the report should have been disclosed because it shows that Surry County Sheriff Hall was present at the parole hearing. Petitioner's argument is premised on the assumption that Sheriff Hall's presence at the parole hearing—held at the Surry County jail—created expectations in Wilson that his assistance with Petitioner's case would impact Wilson's charges pending in Surry County. The Magistrate Judge recommended and this Court accepts a finding that Agent Perry's report was not material because "the hearing location provided a reasonable explanation for Sheriff Hall's presence, in addition to the fact that there is no showing in the record of any action by Sheriff Hall that would have led Wilson to think that he would receive some help on his pending charges." (Rec. of United States Magistrate Judge at 11). To summarize the Magistrate Judge's findings, the state's failure to disclose Special Agent Perry's report of his attendance at Wilson's parole revocation hearing does not violate *Brady* because it is not exculpatory, it is not material, and it does not contain information that was not otherwise available to Petitioner at trial. Petitioner's *Brady* challenge to Special Agent Perry's report is dismissed.

## D.

■ Petitioner also objects to the Magistrate Judge's determination that the

state did not violate *Brady* when it did not disclose a proclamation issued by the Governor's office that announced a monetary reward for information about Mrs. Poore's murder. The Governor's Proclamation stated, "The payment of this reward or any portion thereof is conditional upon the information being furnished as a direct result of the issuance of this proclamation." Petitioner asserted that the language in this proclamation is material because it could have induced Wilson to lie about Petitioner's involvement in the murder.

The Magistrate Judge correctly conducted a *de novo* review of Petitioner's *Brady* claims with respect to the Governor's proclamation and made the following recommended findings: (1) there is no evidence that Wilson knew of this proclamation. If he was not aware of it, then it was not material because it could not have served as an inducement for his testimony; and (2) if Wilson was aware of the Governor's proclamation, then Petitioner's trial counsel should also have known about it. (Rec. of United States Magistrate Judge at 13). If the defense counsel could have discovered the proclamation through due diligence,[2] then there is no *Brady* violation. *Hoke v. Netherland,* 92 F.3d 1350, 1355 (4th Cir.1996). Petitioner's *Brady* challenge to the Governor's reward proclamation is dismissed.

## E.

Petitioner also objects to the Magistrate Judge's determination that the state's failure to disclose a report that Captain Shel-

---

**2.** In order for a reward proclamation seeking information about a particular crime to be effective, it must be widely publicized in the area in which the crime occurred. The state notes, in its response to the habeas petition, that the Governor's Proclamation announcing

the award could have been discovered by the defense attorneys in the exercise of due diligence. (Respondent's Mem. of Law in Supp. of its Answer to Chandler's Pet. for Writ of Habeas Corpus, at 14).

ton completed following his first interview with Petitioner on February 1, 1993 does not constitute a *Brady* violation. This report included a notation that "Chandler never said that he touched or fondled her in any way." (Motion for Appropriate Relief p. 27, ¶ 40). In his petition, Petitioner argued that the note means that Petitioner made an affirmative statement that he did not touch or fondle Mrs. Poore and that such an affirmative statement is exculpatory and should have been disclosed.

■ At the Motion for Appropriate Relief hearing, Special Agent Perry testified that his interpretation of the note was that Petitioner did not make a statement one way or the other as to whether Petitioner touched or fondled the victim. (Mot. Appropriate Relief Mem. Op. Final Order at 27, ¶ 41). The MAR court made a factual finding that Petitioner did not make an affirmative statement to officers that he did not fondle or touch Mrs. Poore and that the effect of the notation was that Petitioner "had never made a statement, positive or negative, about touching or fondling the victim." (Motion for Appropriate Relief p. 29, ¶ 46). Although the MAR court did not conduct a *Brady* analysis of whether the report should have been disclosed, the Magistrate Judge correctly deferred to the factual finding by the MAR court that Petitioner did not make an affirmative statement regarding whether he touched Mrs. Poore and that the "notation was not exculpatory." (Rec. of United States Magistrate Judge at 14). The Magistrate Judge further noted that Petitioner had not rebutted the presumption that the MAR court's factual finding is correct. Ultimately, the Magistrate Judge conclud-

ed that the report was not exculpatory because the report did not contain an affirmative statement by Petitioner that he did not fondle Mrs. Poore. Because the report was not exculpatory, the state's failure to disclose the report could not have constituted a *Brady* violation. (Rec. of United States Magistrate Judge at 14). Petitioner's *Brady* challenge to this report is dismissed.

F.

■ Sixth, Petitioner objects to the Magistrate Judge's determination that the state's failure to disclose a State Bureau of Investigation Report of handwriting analysis of a letter that was purportedly written by Wilson is not a *Brady* violation. The letter stated that Wilson had not talked to prosecutors about Petitioner and that he would not testify either for the state or the defense at trial. The letter also stated that if Wilson were questioned about any statements he had made, he would say that "he had lied concerning his pending charges." (Mot. Appropriate Relief Mem. Op. Final Order at 26, ¶ 33). When questioned by Special Agent Perry, Wilson denied writing the letter. Wilson also denied writing the letter when he testified at Petitioner's MAR hearing.

The handwriting analysis report stated that there were some similarities between Wilson's sample handwriting and the letter, which led the examiner who prepared the report to state that he held "a degree of belief" that Wilson wrote the letter.[3] (Mot. Appropriate Relief Mem. Op. Final Order at 26, ¶ 39). However, the report also stated that the examiner needed more samples of Wilson's handwriting in order

---

3. The report stated:

It is this Examiner's opinion that there was enough similarity between the questioned writing on Item Q–1(A) and the known handwriting on Item K–1 to warrant a degree of belief that they were written by the same author. The examination of the original questioned document and additional nonindicated standards may aid this examiner in reaching a more definite opinion.

to make a conclusive determination. Petitioner claims that this report shows that the letter was written by Wilson, and thus that the report should have been disclosed because it was exculpatory.

The MAR court found that there was no *Brady* violation with respect to the State Bureau of Investigation report. First, the MAR court found that Petitioner's counsel had a copy of the letter, which could have been used for impeachment purposes at trial, but was not used to impeach Wilson's testimony. (Mot. Appropriate Relief Mem. Op. Final Order at 29, ¶ 45). Second, the MAR court found that an "inconclusive analysis of the handwriting as in the State Bureau of Investigation laboratory report thereon does not rise to the level of impeaching evidence which could have been used effectively." (Motion for Appropriate Relief p. 29, ¶ 45).

The Magistrate Judge correctly observed that "the lab report itself was not material impeaching or exculpatory evidence. The state trial court did not reach a result contrary to federal law or one that involves an unreasonable application of federal law." (Rec. of United States Magistrate Judge at 16). Petitioner's *Brady* challenge to the State Bureau of Investigation lab report is dismissed.

### G.

Finally, with respect to Petitioner's *Brady* claims, the Magistrate Judge considered whether "cumulatively the suppressed evidence might have made a difference in the outcome of petitioner's trial." (Rec. of United States Magistrate Judge at 16) (citing *Kyles*, 514 U.S. at 436–37, 115 S.Ct. 1555). The Magistrate Judge correctly concluded that there is no reasonable possibility the outcome of Petitioner's trial would have been different. (Rec. of United States Magistrate Judge at 16). The Magistrate Judge stated that even

without the evidence Petitioner has challenged, Wilson was thoroughly questioned about his motives for testifying, about his extensive criminal history, about his drug addiction, and about any assistance he received from Special Agent Perry with respect to his parole revocation hearing. The Magistrate Judge recommended and this Court agrees that, when considered cumulatively, the evidence Petitioner challenged "would not have made a significant difference in the jury's perception of Wilson and his motive for testifying." (Rec. of United States Magistrate Judge at 16). Petitioner's *Brady* challenge to all of the evidence considered cumulatively is dismissed.

### V.

Next, Petitioner objects to the Magistrate Judge's recommendation that Petitioner's Sixth Amendment right to counsel was not violated. Petitioner asserts that the Magistrate Judge applied to wrong standard in determining whether his Sixth Amendment right to counsel was violated because his trial attorneys had conflicts of interest in the case. Petitioner bases his conflict-of-interest claim on the fact that one of his attorneys at trial had previously represented Jeffrey Kyle Wilson, a key prosecution witness. At trial, Petitioner was represented by two attorneys, James D. Gillespie and Terry L. Collins. Gillespie had represented Wilson in 1988 when Wilson pleaded guilty to forgery and uttering charges. In addition, Assistant District Attorney Yeatts, the prosecutor in Petitioner's case was the prosecutor in the case against Wilson on these forgery and uttering charges.

Petitioner asserts that the Magistrate Judge's recommendation on the conflict of interest issue is erroneous because it applies the standard for disclosed conflicts of interest rather than the standard for un-

disclosed conflicts of interest. The Magistrate Judge correctly identified and applied the long-standing rule with respect to conflicts of interest and the right to counsel.

The Sixth Amendment guarantees all criminal defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish a claim of ineffective assistance of counsel, the defendant must satisfy the two-prong *Strickland* test. First, a defendant must show that his counsel's performance was below the level expected of a reasonably competent attorney. *Id.* at 687, 104 S.Ct. 2052. Second, the defendant must establish prejudice, which is accomplished by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

The right to effective assistance of counsel encompasses the right to counsel who is free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). When a habeas petitioner claims that his Sixth Amendment right to counsel has been violated because of his attorney's conflict of interest, the two-part *Strickland* analysis for ineffective assistance claims is modified slightly. *See Burket v. Angelone*, 208 F.3d 172, 184 (4th Cir.2000). On a conflict-of-interest claim, the performance element of *Strickland* is satisfied if the defendant can show that his attorney had "an actual conflict of interest" *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). An actual conflict arises when counsel "actively represents conflicting interests." *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir.1991). In addition, if there is an actual conflict of interest that adversely affects the lawyer's performance, the prejudice element of *Strickland*

is presumed, and a new trial is required. *Id.* at 376; *Cuyler*, 446 U.S. at 348–50, 100 S.Ct. 1708.

Petitioner asserts that the Magistrate Judge should have applied the analysis required when the trial court fails to make an inquiry into a potential conflict when the court knows or reasonably should know that a potential conflict exists. Petitioner has no factual basis for his argument, however, because the Petitioner has not presented any evidence that the trial court in his initial trial either knew or had any reason to know of Gillespie's prior representation of Wilson. In addition, the MAR court made a factual finding that any potential conflict of interest had been disclosed to Petitioner. (Mot. Appropriate Relief Mem. Op. Final Order at 13, ¶ 33) In his recommendations, the Magistrate Judge correctly deferred to the MAR court's factual findings that there was no actual conflict of interest and that any potential conflict of interest had been disclosed to Petitioner. Petitioner has not presented clear and convincing evidence to rebut the presumption that this potential conflict was disclosed to Petitioner.

In his objections, Petitioner also asserts that the Magistrate Judge did not properly apply Fourth Circuit conflict of interest precedent in cases where an attorney represents a criminal defendant and a witness against the defendant. (Petitioner's Objections to Magistrate Judge's Rec. at 52) (citing *Hoffman v. Leeke*, 903 F.2d 280 (4th Cir.1990)). However, Petitioner's reliance on *Hoffman* is misplaced. *Hoffman* involved a situation where an attorney contemporaneously represented both the defendant and his co-defendant. *Id.* at 286–87. The attorney negotiated a plea agreement for the co-defendant, who was then called as a witness against the defendant at trial. *Id.* at 286–87.

■ The more appropriate Fourth Circuit precedent involves a situation where an attorney *formerly* represented an individual who, afterward, became a witness against a current client. The Fourth Circuit has recognized that a conflict of interest may exist "in successive representation cases in which a former client has become an adverse witness" against a current client. *United States v. Esposito*, 816 F.2d 674 (4th Cir.1987) (unpublished table opinion), available at 1987 WL 37105 *2 (affirming the district court's pre-trial disqualification of defendant's attorney where there was the potential for conflict because the attorney obtained confidential information from the former clients). Usually the conflict in these cases arises when (1) on cross-examination of the former client, the attorney is "tempted to violate the privilege and use information learned in the confidential communications between him and the witness to benefit the defendant"; (2) counsel may "hesitate to conduct a rigorous cross-examination for fear of breaching the confidential relationship" and thus violate defendant's right to effective assistance of counsel; or (3) the attorney's "pecuniary interest in the future business of the witness may cause him to avoid trial tactics which, while beneficial to the defendant, may prejudice the former client." *Id.*

In Petitioner's case, none of these three scenarios are present.[4] Collins, who had not previously represented Wilson, conducted the cross-examination of Wilson at trial. (Mot. Appropriate Relief Mem. Op. Final Order at 9, ¶ 15). There is no evidence to support an assertion that Collins hesitated to conduct a vigorous cross examination of Wilson for fear that he would breach a confidential relationship to the detriment of Petitioner. In fact, the trial transcript demonstrates the Wilson was very thoroughly and effectively cross-examined. As to the third scenario, there is no evidence to suggest that either Collins or Gillespie were seeking to protect a pecuniary interest in having a future business relationship with Wilson.

Finally, the Magistrate Judge correctly concluded that Petitioner had not shown any prejudice as a result of Gillespie's prior representation of Wilson. In his objections to the Magistrate Judge's Recommendations, Petitioner asserts that this conclusion was erroneous for two reasons: (1) Trial counsel did not adequately investigate and impeach Wilson regarding his financial motive for testifying; and (2) Trial counsel did not properly prepare to cross-examine Wilson by interviewing him at the Surry County Jail.

■ As to the cross-examination of Wilson regarding his financial motive for testifying, the Magistrate Judge observed: "Counsel questioned Wilson extensively during trial regarding his motivation for testifying against petitioner. He attempted to get Wilson to admit that he was testifying in hopes of personal gain rather than for totally unselfish reasons." (Rec. of United States Magistrate Judge at 20). In addition, the Magistrate Judge noted that "there is no showing that Gillespie's prior representation of Wilson hindered this aspect of cross-examination or that there was ever a divergence of interests with regard to it." (Rec. of United States Magistrate Judge at 20). In his objection, Petitioner reasserts his position that due

---

**4.** The first scenario is not applicable to Petitioner's case. In such a scenario, the conflict of interest would benefit Petitioner to the detriment of Wilson. The MAR court specifically found that Gillespie had not obtained any potentially impeaching information about Wilson during the prior representation (Mot. Appropriate Relief Mem. Op. Final Order at 9, ¶ 13).

to a conflict of interest, trial counsel did not question Wilson about the possibility of receiving a reward. However, Petitioner still has not demonstrated that he suffered prejudice, that the outcome of the trial would have been different, as a result of not asking Wilson about the reward. As noted previously, Wilson was effectively cross-examined at trial regarding his motives for testifying. Petitioner's Sixth Amendment challenge for failure to cross-examine Wilson about the possibility of receiving reward money is dismissed.

▮ Additionally, Petitioner reasserts that he was prejudiced because trial counsel did not properly prepare to cross examine Wilson by not going to the jail to speak with Wilson prior to his testimony. The Magistrate Judge appropriately noted "there is no showing that counsel's decision not to visit Wilson in jail was due to Gillespie's prior representation of Wilson ... there is no showing of any specific information that such an interview would have revealed." (Rec. of United States Magistrate Judge at 20). Petitioner has not shown any evidence that Petitioner's trial counsel could have obtained by visiting Wilson in jail. Thus, Petitioner is unable to show how an interview of Wilson by his trial counsel could have resulted in a different outcome at trial. Petitioner has not shown that he suffered prejudice, and his Sixth Amendment challenge to his trial counsel's failure to interview Wilson in jail is dismissed.

### VI.

▮ Petitioner also challenges the jury instructions that were given at his trial and sentencing. Questions regarding jury instructions are matters of state law that generally are not properly considered on federal habeas review, unless a specific constitutional issue such as due process is called into question. *Sandstrom v. Mon-*

*tana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

### A.

▮ Petitioner contends the trial court violated his Eighth and Fourteenth Amendment rights by refusing to submit a statutory mitigating circumstance to the jury. As the Magistrate Judge correctly explained, the Eighth and Fourteenth Amendments require that the jury considering a sentence of death must not be precluded from considering, as a mitigating factor, aspects of a defendant's character that may lead a jury to decide a sentence of life imprisonment rather than death. (Rec. of United States Magistrate Judge at 25) (*citing Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)).

In his § 2254 petition, Petitioner claimed that the jury was not allowed to consider as a mitigating circumstance that he was under the influence of a mental or emotional disturbance at the time of the crime. He claims that the jury should have been allowed to consider that he was drinking alcohol and smoking marijuana prior to committing the crime and that he suffered from a mixed personality disorder and a substance abuse disorder.

In discussing this claim, the North Carolina Supreme Court found:

A trial court is not required to submit a mitigating circumstance to the jury unless it is supported by substantial evidence. *State v. Miller,* 339 N.C. 663, 455 S.E.2d 137, cert. denied, 516 U.S. 893, 116 S.Ct. 242, 133 L.Ed.2d 169 (1995). Here, the evidence did not support defendant's contention that he was under a mental or emotional disturbance at the time of the murder. The only witness called to testify in support of any claim of mental or emotional impairment was Dr. John Warren, a clinical

psychologist. Dr. Warren testified that defendant suffers from substance abuse disorder including the substances of alcohol and marijuana primarily, and LSD occasionally. He opined that in such individuals alcohol abuse blocks out controls or inhibitions. He testified that defendant told him that he had been drinking fortified wine on the night in question. Dr. Warren also testified that defendant suffered from mixed personality disorder with immature, impulsive, antisocial, and emotionally unstable features that, among other things, made the defendant more impulsive than a normal person.

However, on cross-examination, Dr. Warren testified that defendant has an average-range IQ and that he was competent to stand trial. He also testified that he did not have any independent corroboration to the effects of any alcohol that defendant allegedly consumed on the night in question other than what he had been told by the defendant—a defendant who had also denied having any involvement in the murder during Dr. Warren's examination of him six months prior to trial. Moreover, Dr. Warren did not testify about the specific effects, if any, that alcohol may have on a person diagnosed with mixed personality disorder.

Assuming arguendo that defendant was under the influence of fortified wine at the time he committed the murder, in *State v. Irwin*, 304 N.C. at 105–06, 282 S.E.2d at 447–48, we held that voluntary intoxication by alcohol or drugs at the time of the commission of a murder does not qualify as a mental or emotional disturbance under the statute. *See also State v. Greene*, 329 N.C. 771, 775, 408 S.E.2d 185, 186 (1991). Thus, defendant's alleged voluntary alcohol use on the night in question does not qualify as a mental or emotional disturbance for

purposes of N.C.G.S. § 15A–2000(f)(2). This assignment of error is overruled. *State v. Chandler*, 342 N.C. at 756–57, 467 S.E.2d at 644–45

The Magistrate Judge recommended a finding that the North Carolina Supreme Court's affirmation of the trial court's decision not to give the requested instruction was not contrary to federal law and did not involve an unreasonable application of federal law. (Rec. of United States Magistrate Judge at 26). In doing so, the Magistrate Judge correctly applied the *Lockett v. Ohio* standard and observed that Petitioner's Eighth and Fourteenth Amendment rights were not violated because, "the jury was not prevented from considering any of the evidence petitioner relies upon in this claim. The jury simply was not given an instruction on the specific mitigating circumstances that petitioner desired." (Rec. of United States Magistrate Judge at 25). The jury was instructed that they consider "any circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value." (Trial Tr. Vol. VIII, at 1035). The North Carolina Supreme Court decision that this instruction was sufficient is not contrary to federal law and does not involve an unreasonable application of federal law. Petitioner cites no authority for the proposition that during the sentencing phase of a capital case a jury should be instructed on specific mitigating circumstances which are not sufficiently supported by the evidence. This ground for relief is dismissed.

### B.

▮▮▮ Petitioner also objects to the Magistrate Judge's Recommendations regarding the definition of mitigation in the jury instructions. Petitioner has argued that his Eighth and Fourteenth Amendment

rights were violated because the trial court gave the jury a restrictive definition of mitigation. The Magistrate Judge rejected this argument, however, and recommended a finding that the instruction was constitutional. (Rec. of United States Magistrate Judge at 27). The definition given to the jury was the following:

> Now, a mitigating circumstance is a fact or a group of facts which do not constitute a justification or excuse for a killing, or reduce it to a lesser degree of crime than first degree murder, but which may be considered as extenuating or reducing the moral culpability of the killing, or making it less deserving of extreme punishment than other first degree murders.
>
> Our law identifies several possible mitigating circumstances. However, in considering Issue No. 2 it would be your duty to consider as mitigating circumstances any aspect of the defendant's character or record or any of the circumstances of this murder that the defendant contends is a basis for a sentence less than death, and any other circumstances arising from the evidence, which you, the jury, deem to have mitigating value.

(Trial Tr. Vol. VIII, at 1071–72).

In his objections to the Magistrate Judge's Recommendation, Petitioner isolates the first paragraph of this instruction and asserts that this definition of mitigation is restrictive because it focuses exclusively on the facts of the crime without regard for the individual circumstances of the Petitioner. Petitioner argues that this definition did not allow the jury to consider his youth, immaturity, and impairment at the time of the crime and, in fact, permitted the jury to ignore facts about his life.

■ As the Magistrate Judge correctly explained, to determine if a jury instruction is constitutional, a court must consider "whether there is reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). In Petitioner's case, the Magistrate Judge noted that the instruction did not prevent the jury from considering all of the circumstances particular to the Petitioner. (Rec. of United States Magistrate Judge at 27). In fact, the entire instruction, not just the first paragraph that petitioner isolates, specifically allows the jury to consider Petitioner's character. Factors regarding Petitioner's youth, immaturity, and impairment at the time of the crime were presented to the jury through the testimony of witnesses. (Rec. of United States Magistrate Judge at 27–28). Petitioner has not any presented any evidence to demonstrate that there is a reasonable likelihood that the jury misinterpreted the instruction and ignored the evidence presented at trial with respect to Petitioner's character.

The challenged jury instruction is not contrary to established federal law and does not constitute an unreasonable application of federal law. Therefore, the Petitioner's Eighth and Fourteenth Amendment challenges to the jury instruction on the definition of mitigation is dismissed.

## VII.

In summary, the Recommendation of the Magistrate Judge to Deny the Petition is ADOPTED, and the Petition for Habeas Corpus relief is DENIED.

## JUDGMENT

For the reasons set forth in a Memorandum Opinion filed contemporaneously, it is ORDERED THAT the Petition for a Writ

of Habeas Corpus pursuant to 28 U.S.C. § 2254 be DENIED.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

ELIASON, United States Magistrate Judge.

Petitioner seeks relief pursuant to 28 U.S.C. § 2254. A jury convicted petitioner in state court of first-degree murder and attempted larceny.[1] The jury recommended death as his sentence. The Supreme Court of North Carolina upheld his conviction and sentence on appeal. *See State v. Chandler,* 342 N.C. 742, 467 S.E.2d 636, *cert. denied,* 519 U.S. 875, 117 S.Ct. 196, 136 L.Ed.2d 133 (1996). Petitioner filed a Motion for Appropriate Relief in the North Carolina Superior Court, but the court denied relief after holding an evidentiary hearing. The Supreme Court of North Carolina denied certiorari review.

The evidence of petitioner's guilt is very substantial and is set out in the opinion of the Supreme Court of North Carolina. To briefly summarize, on December 10, 1992, family members and a housekeeper found Mrs. Doris Poore dead in her bed in her residence in Mt. Airy, North Carolina. Police determined that the back door of the residence had been forced open. Mrs. Poore's body was lying on the bed with the top of her pajamas open and she was nude from the waist down. Her panties and the bottoms of her pajamas were on the bed at her feet.

The pathologist testified that Mrs. Poore died from a single, massive blow to her head. Police found petitioner's palm print on the back door which had been forced open. Petitioner allowed police to finger-print him, but after having provided his prints, he attempted to destroy the finger-print card and other documents.

Jeffrey Kyle Wilson, petitioner's cellmate in jail, testified at trial that petitioner described for him how he committed the murder of Mrs. Poore. Petitioner told Wilson that as a defense he planned to "play crazy."

Petitioner testified as his only defense witness during the guilt phase of his trial. He admitted forcing his way into Mrs. Poore's home, described how she startled him as he walked through her house, and confessed to striking her, catching her as she fell, and carrying her to her bed. Petitioner testified that he went to her bathroom to wash the blood off his hands and picked up her panties and pajama bottoms off the bathroom floor and put them in her bed and covered her up.

Petitioner testified that he had not known who lived in Poore's house, but thought that a man lived there because he had seen a blue pickup truck parked in front of the house and a man smoking marijuana there. On cross-examination, petitioner said that after killing Mrs. Poore he did not look for the marijuana as he had originally planned.

### Standard of Review

If the Court finds that the claims were adjudicated on the merits, it must then apply 28 U.S.C. § 2254(d)'s highly deferential standard of review to petitioner's claims. That statute states that habeas relief cannot be granted in cases where a state court has considered a claim on its merits unless the decision was contrary to or involved an unreasonable application of clearly established federal law as set out by the United States Supreme Court or

---

1. The jury found petitioner not guilty of attempted first-degree rape and first-degree sexual offense. He was found guilty of first-degree murder under the felony murder rule, with first-degree burglary as the underlying felony.

the state court decision was based on an unreasonable determination of the facts. A state court decision is "contrary to" Supreme Court precedent if it either arrives at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court. *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000). A state decision "involves an unreasonable application" of Supreme Court law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.,* 120 S.Ct. at 1520. "Unreasonable" is not the same as "incorrect" or "erroneous" and the reasonableness of the state court's decision must be judged from an objective, rather than subjective, standpoint. *Id.* at 1521–1522. A holding is not reasonable simply because precedent written by one of the Nation's jurists agrees with it. *Id.* As for questions of fact, state court findings of fact are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### *Ground I–Failure to Disclose Impeachment Evidence*

■ Petitioner claims that the State failed to disclose impeachment evidence of its witness Wilson[2] in violation of *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To establish a *Brady* violation, petitioner must show that evidence favorable to him was suppressed by the prosecution and that the evidence was material either to his guilt or punishment. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. Evidence is material if there is a reasonable probability that its disclosure would have changed the result of the trial. *See United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). There is no "reasonable probability" of a different result if, in the absence of the evidence, petitioner received a fair trial which is understood as a trial resulting in a verdict worthy of confidence. *See Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

■ As for petitioner's claims of perjured testimony, the prosecution may not knowingly present false testimony or allow such testimony to go uncorrected. *See Giglio,* 405 U.S. at 153–54, 92 S.Ct. 763. A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment. *Id.*

Petitioner places his evidence into five categories.

**a. Expectation of sentencing concessions.** The first category is composed of three pieces of evidence which petitioner claims bear on Wilson's expectation of sentencing concessions or assistance. The first piece of evidence is a question Wilson asked of Mt. Airy Police Detective Shelton prior to Wilson giving a statement to Shelton and SBI Agent Perry. The question was: "What's in it for me?" Petitioner claims that this question reveals Wilson's true intentions in making his statement and would have been used to impeach Wilson on his trial testimony that he made his statement not for personal gain, but because he did not want to see such a crime

---

2. The parties strongly disagree on the relative importance of Wilson's trial testimony. (*See* Petitioner's reply brief at 1–3; Respondent's memorandum of law in support of answer at 3–4).

against an older person happen again. (Petitioner's Br. at 5–7)

The state court hearing petitioner's motion for appropriate relief addressed this claim. It reasoned that because there was no agreement, express or implied, between the police and Wilson, there was no violation of *Giglio*. (*Id.* at 24, 25, ¶ 26, 27). The court did not make specific findings regarding the materiality of Wilson's question. The factual findings made by the state court are presumed correct in this proceeding absent petitioner's rebuttal of them by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The state court found that Detective Shelton responded to Wilson's question by stating that the police could not give Wilson anything, and that if a deal was to be tied to this information, then officers did not want the information. (Order on Motion for Appropriate Relief, at 23, ¶ 14) SBI Agent Perry told Wilson the same thing. (*Id.*) The state court further found that Wilson never mentioned the possibility of a deal again. (*Id.*) The court found that there was no deal of any kind between agents of the State and Wilson for his statement or testimony. (*Id.* at 24, ¶ 25) The court found that when Wilson testified, he hoped to receive some reward money, but that he had originally approached law enforcement with the information about petitioner as a matter of conscience. (*Id.* at 20, ¶ 4)

In addition, defense counsel thoroughly cross-examined Wilson at trial regarding his possible motives for giving the information to the police. These motives included Wilson seeking assistance by asking SBI Agent Perry to come to his parole revocation hearing to testify that Wilson had provided information in the Poore murder

case. Wilson admitted that he thought Perry's testimony would help him.[3] (Trial Tr. Vol. V, at 628). Defense counsel also reviewed in detail Wilson's lengthy criminal history which included many crimes involving deception, such as forgery and uttering, and Wilson's pending charges had been exposed on direct examination. (*Id.* at 605–06, 618–24) Wilson also admitted that he was a cocaine addict. (*Id.* at 625) To sum up, although Wilson never admitted that he was seeking help on any of his pending charges, defense counsel successfully impeached his testimony by having Wilson admit that he sought gain by having an officer testify at his parole hearing, by detailing Wilson's lengthy criminal history, and by establishing that another possible motive for Wilson's testimony was to receive help with his pending charges.

Against this background of successful impeachment, Wilson's question to Detective Shelton was of very limited impeachment value. First, it was a single, isolated question. Second, Wilson gave his statement immediately after the officers told him that there would be no deals. Third, indeed no deals were made with Wilson for his statement or testimony. This Court finds that there is no reasonable probability that disclosure of this question would have changed the result of petitioner's trial. Petitioner received a fair trial even in the absence of this evidence. Therefore, petitioner has failed to establish a *Brady* violation.

The second and third pieces of evidence which were not disclosed to defense counsel are copies of SBI and Mt. Airy Police Department reports of the interview of Wilson held on February 1, 1993, in which

---

3. Agent Perry did, in fact, attend Wilson's parole hearing and testified that Wilson had provided information in the Poore case, but Wilson's parole was revoked nevertheless. (Order on Motion for Appropriate Relief, at 16, ¶ 42)

Wilson lists his pending charges and parole violations. Petitioner contends that these reports show that Wilson testified falsely when he testified that he had not "brung up" his charges in relation to his giving of the information on petitioner or his testifying at petitioner's trial.

However, the state court found in rejecting petitioner's motion for appropriate relief that this listing came as a response to the officers asking Wilson why he was in jail. (Order on Motion for Appropriate Relief, at 21, ¶ 9) The state court found that since "no agreement existed, implied or express, the State did not present perjured testimony through Wilson when he testified that he had not brought up his pending charges in expectation of a sentencing concession." (*Id.* at 24–25, ¶ 27)

Under 28 U.S.C. § 2254(e)(1), this factual finding that Wilson did not initiate the discussion of his pending charges is presumed to be correct, and petitioner has not rebutted that presumption. This finding robs petitioner's argument of any force. The statement would not have been impeaching, and thus there was no *Brady* violation.

■ Moreover, SBI Agent Perry testified during petitioner's trial that Wilson had given him this information regarding "what he was in jail for." (Trial Tr. Vol. IV, at 597) Therefore, this information was disclosed at trial before Wilson testified. There is no actionable failure to disclose evidence when defense counsel is aware of the evidence in time to make use of it at trial. *See United States v. Smith Grading & Paving, Inc.,* 760 F.2d 527, 532 & n. 6 (4th Cir.1985).

In addition to the *Brady* claims, petitioner claims violations of *Giglio.* Dealing first with the reports made of Wilson's interview; this Court agrees with the state court that since the investigators first broached the subject of what Wilson was

in jail for, his response does not show that Wilson testified falsely when he stated that he had not "brung up" his charges in relation to the information he gave officers. Moreover, even if Wilson had first broached this subject, since Perry disclosed at trial that Wilson had spoken to Perry and Shelton about what he was in jail for, petitioner waived any objection to Wilson's testimony by waiting until after trial to bring the question to the attention of the court. *See United States v. Meinster,* 619 F.2d 1041, 1045–46 n. 8 (4th Cir.1980).

Turning now to petitioner's *Giglio* claim premised upon Wilson's "What's in it for me" question, this Court finds that the question does not establish false testimony. First, the question fails to reveal whether Wilson was referring to pending charges when he asked the question. The state court made the finding of fact that when Wilson testified he hoped to receive reward money. This question could have referred to that possibility. Or, Wilson could have been thinking about his parole revocation hearing which was scheduled for the near future. That Wilson's question referred to his pending charges in Surry County, even when considered with the fact that the officers asked him about his pending charges in concluding his interview, is not at all clear.

Second, Wilson's denials at trial that he had discussed his charges presuppose some meaningful discussion of them in the hope of making a deal in exchange for his information. The state motion for appropriate relief court found that when prosecutor Yeatts questioned Wilson during petitioner's trial, "he and Wilson were talking about whether anybody had promised Wilson anything or made any deals with him with regard to his pending charges." (Order on Motion for Appropriate Relief, at

23, ¶ 16) Wilson's posing of his question to Detective Shelton simply does not prove false his denials during trial when they are considered in context.

**b. Expectation of assistance in parole hearing.** SBI Agent Perry attended Wilson's parole revocation hearing and subsequently made a written report of his attendance. The written report was not disclosed, but the prosecution revealed before trial that a state agent had appeared before a parole board to ask that a possible state's witness be given some consideration. Also, Agent Perry testified at trial that he had attended Wilson's parole hearing and had told the parole hearing officer that Wilson "had provided information to investigating officers on this case." (Trial Tr. Vol. IV, at 591, 597) In addition, Wilson testified that he expected that Perry's presence might help him serve less time and that Perry attended the hearing. (*Id.* Vol. V at 608, 623)

Petitioner takes issue with the failure of the prosecution to produce the copy of Perry's report. The state court hearing petitioner's motion for appropriate relief found no constitutional violation. (Order on Motion for Appropriate Relief, at 24) Petitioner first contends that the report itself would show that Perry viewed his attendance at the parole hearing as part of his duties for the murder investigation. Petitioner fails to explain why he could not have drawn such a link from Perry's testimony in the murder case and the prosecutor's admission in a pretrial hearing that a state's witness in the case had been given some consideration. This Court finds that the written report would not have provided any greater basis for linking Agent Perry's attendance at the hearing to his duties in the murder investigation than the information otherwise provided to the petitioner.

Second, petitioner contends that the report would have "been used by defense counsel to refute Mr. Perry's testimony and to discredit the State for its misleading questions of Mr. Wilson." (Petitioner's Br. at 19) As stated previously, Perry testified that his intent in attending Wilson's parole hearing was to relate that Wilson provided information in the Poore case. Petitioner fails to show how the report in any way refutes this or any other testimony of Perry. Moreover, petitioner cites no part of the report which would discredit the State in any manner.

Third, petitioner argues that the report shows that Surry County Sheriff Hall was present at the parole hearing, which is significant because Surry County had pending charges on Wilson, and arguably created expectations in Wilson of receiving help on these charges. However, the parole hearing was held in Sheriff Hall's jail. (Trial Tr. Vol. IV, at 592) Given that the hearing location provided a reasonable explanation for Sheriff Hall's presence, in addition to the fact that there is no showing in the record of any action by Sheriff Hall that would have led Wilson to think that he would receive some help on his pending charges, this Court finds no basis for petitioner's theory that Sheriff Hall's presence created expectations in Wilson of receiving help on his pending charges.

Therefore, the Court finds that Agent Perry's report of his attendance at Wilson's parole hearing was not material given the other evidence disclosed and that the report does not show that the prosecution presented any false testimony.

**c. Expectation of reward money.** The Governor of North Carolina offered a $5000 reward for information in the Poore murder case. The Governor's Proclamation stated: "The payment of this reward or any portion thereof is conditional upon the information being furnished as a direct result of the issuance of this proclamation." Petitioner contends that this lan-

guage would have been evidence of inducement for Wilson to embellish his testimony and that it should have been disclosed.[4]

The respondent contends that the reward would have to have been well-publicized to be effective and that the defense attorneys with due diligence could have discovered the proclamation.

The state court hearing petitioner's motion for appropriate relief made several relevant factual findings. The court found that no agreement of any kind, including a monetary reward and/or sentencing concession, express or implied, was offered or made between any agent of the State and Jeffrey Kyle Wilson. (Order on Motion for Appropriate Relief, at 24, ¶ 25) The court also found that the "subject of a reward fund had never come up in any of the meetings with Wilson." (*Id.* at 23, ¶ 17) Assistant District Attorney Yeatts "did not know about the Governor's reward fund until after defendant's trial was over." (*Id.*) And finally, District Attorney Dellinger "had no recall of Wilson stating that he was interested in a monetary reward prior to defendant's trial." (*Id.* ¶ 20)

[32] Therefore, it appears that although by the time he testified, Wilson hoped for some money (*Id.* at 20, ¶ 4), no state agent had discussed a possible monetary reward with Wilson. Although Wilson may have known of the reward money being offered, petitioner points to no evidence that Wilson had knowledge of the language in the proclamation. If Wilson did not know about the language of the proclamation, the proclamation is not material evidence because it could not have been a basis for Wilson to embellish his

testimony. If, on the other hand, Wilson had somehow discovered the language of the proclamation, surely defense counsel could have discovered it with due diligence. If counsel with due diligence could have discovered the suppressed evidence, there is no *Brady* violation. *See Hoke v. Netherland,* 92 F.3d 1350, 1355 (4th Cir.1996). Under either scenario, there was no *Brady* violation.

**d. Statement of petitioner.** The February 1, 1993 Mt. Airy Police Department report of the interview of Wilson contained a notation that "Chandler never said that he touched or fondled her in any way." This, of course, refers to the victim, Mrs. Poore. Petitioner argues that this notation should be read as though Chandler made the affirmative statement that he did not fondle Mrs. Poore and that the notation would be exculpatory. However, after hearing from Detective Shelton and Agent Perry during the motion for appropriate relief hearing, the state court found that the notation meant that Chandler had not made a statement either that he had or had not fondled Mrs. Poore. (Order on Motion for Appropriate Relief, at 29, ¶ 46) Thus, petitioner's argument is based upon facts contrary to the state court finding. He has not rebutted the presumed correctness of the state court finding, however. *See* 28 U.S.C. § 2254(e)(1). Therefore, that finding is binding on this court and based upon it, petitioner's argument has no merit. The notation was not exculpatory.

**e. SBI lab report.** An SBI Lab Report dated July 13, 1993 bore the results of the analysis of a handwritten letter pur-

---

**4.** Petitioner's argument is that because the proclamation by its terms required knowledge of the proclamation in order to be entitled to the reward and because Wilson got the reward, this proves that Wilson necessarily knew about the reward before he testified.

The falsity of the syllogism is that it denies the possibility that the terms of the proclamation were not strictly adhered to when Wilson received part of the reward. This latter scenario appears to be the true state of events as found by the state court.

portedly written by Wilson. The letter stated that Wilson had never talked to a District Attorney or any member of the court about petitioner, that Wilson would not testify for either party at petitioner's trial, and that if he were questioned, Wilson would let the court or any officer of the court know that he had lied concerning petitioner's pending charges. (Order on Motion for Appropriate Relief, at 25–26, ¶ 33) The origin of the letter and exactly how it came to exist in the defense counsel's files and in the prosecution's file are all mysteries. (*Id.* at 26–28) Petitioner argues that the lab report confirms that Wilson actually wrote the letter. He claims it was, thus, exculpatory and should have been disclosed.

The report results were as follows:

It is this Examiner's opinion that there was enough similarity between the questioned writing on Item Q–1(A) and the known handwriting on Item K–1 to warrant a *degree of belief* that they were written by the same author. The examination of the original questioned document and additional nondictated standards may aid this Examiner in reaching a more definite opinion.

The fax copy [Item Q–1] did not provide a satisfactory basis for examination and comparison.

(SBI Lab Report dated July 13, 1993)

The state court found after the motion for appropriate relief hearing that the report stated that the examiner's opinion was not conclusive because additional writings were needed. (Order on Motion for Appropriate Relief, at 26, ¶ 37) Wilson denied writing the letter both before trial and at the post-conviction evidentiary hearing. (*Id.* at 26, ¶ 34, 37) The state court also found that a copy of the letter was in both defense counsel's file. (*Id.* at 28, ¶ 45) However, defense counsel did not use the letter at trial. The state court

found that because the letter was not used at trial, the lab report would not have had a significant impact on the theory of defense and did not rise to the level of impeaching evidence. (*Id.* at 29, ¶ 45)

Petitioner argues that the state court erred because if the report had been disclosed prior to trial, then the defense could have sought further expert assistance to prove that Wilson wrote the impeaching letter. (Petitioner's Br. at 24) However, petitioner could have sought expert assistance even without the lab report because defense counsel had the letter prior to trial. This Court agrees that the lab report itself was not material impeaching or exculpatory evidence. The state trial court did not reach a result contrary to federal law or one that involves an unreasonable application of federal law.

This Court must also consider whether cumulatively the suppressed evidence might have made a difference in the outcome of petitioner's trial. *See Kyles,* 514 U.S. at 436–37 n. 10, 115 S.Ct. 1555. Even viewing all of these categories of evidence which petitioner raises, there is no reasonable probability that this evidence would have changed the outcome of petitioner's trial. Wilson was impeached successfully during trial by his criminal record and his admission that he thought Agent Perry's presence at his parole hearing might help him. The jury also knew of Wilson's pending charges. The additional evidence by which petitioner seeks to impeach Wilson would not have made a significant difference in the jury's perception of Wilson and his motive for testifying.

The state court's denial of relief based on petitioner's claims of *Brady* and *Giglio* violations was neither contrary to federal law nor did it involve an unreasonable application of clearly established federal law as determined by the Supreme Court. Accordingly, petitioner's first ground for

relief should be dismissed. *See* 28 U.S.C. § 2254(d); *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).

### Ground II–Attorney Conflict of Interest

Petitioner next contends that his Sixth Amendment rights were violated because his trial attorneys acted under a conflict of interest resulting from the prior representation of witness Wilson. The state court hearing petitioner's motion for appropriate relief found that defense counsel Collins never represented Wilson and that Collins had no conflict of interest whatsoever. (Order on Motion for Appropriate Relief, at 13, ¶ 29) Collins was the attorney who actually cross-examined Wilson during petitioner's trial. The same court found, however, that attorney Gillespie represented Wilson in 1988 on several forgery and uttering charges, which were disposed of by negotiated plea with Assistant District Attorney Yeatts. (*Id.* at 13, ¶ 30)

The state court found that a potential conflict of interest existed because of Gillespie's prior representation of Wilson. (*Id.* ¶ 31) The court also found that Gillespie did not inform the trial court of the potential conflict because he knew of nothing that would amount to an actual conflict. (*Id.*) The court found that Gillespie had obtained no potentially impeaching information of Wilson and that Gillespie did not recall any such information at the time of petitioner's trial or at the post-conviction evidentiary hearing. (*Id.* at 9, ¶ 13) Gillespie informed petitioner of the prior representation. (*Id.* at 13, ¶ 33)

Notwithstanding the potential conflict of interest in regard to one of the counsel, the state court found that petitioner failed to show that an actual conflict existed due to Gillespie's prior representation of Wilson. (*Id.* at 16, ¶ 43) The state court also found that even if an actual conflict had existed, petitioner failed to show that he suffered prejudice. (*Id.* at 17, ¶ 44)

Petitioner contends that the state court clearly erred because it applied the conflict of interest law applicable to disclosed conflicts and in petitioner's case the conflict was not disclosed to him. Petitioner also contends that because the potential conflict was not disclosed to him or the court, prejudice must be presumed. (Petitioner's Br. at 31) Although petitioner contends he need not show prejudice, he does cite specific examples of alleged prejudice. And, petitioner fails to show that ordinary conflict rules apply when a defendant is represented by two attorneys and the non-conflicted attorney does the examination. *Contrast Hoffman v. Leeke,* 903 F.2d 280 (4th Cir.1990)(conflicted counsel taking action on behalf of both clients at the same time for the same events). In any event, there was no error even under ordinary conflict situation rules.

The Supreme Court established the proper test for analyzing a conflict of interest claim in *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* When an actual conflict is present and the conflict adversely affects counsel's performance in the defense of the defendant, prejudice to the defense is presumed and a new trial must be ordered.[5]

---

**5.** There is presently some disagreement in the Fourth Circuit Court of Appeals on whether, when the trial court fails to make an inquiry into the possible conflict when it knows or reasonably should know that a particular conflict exists, the defendant must make the showing of an adverse effect. *See Mickens v. Taylor,* 227 F.3d 203 (4th Cir.2000), *vacated*

*See United States v. Tatum*, 943 F.2d 370, 375 (4th Cir.1991).

To establish an actual conflict of interest, the petitioner must show that his interests "diverge[d] with respect to a material factual or legal issue or to a course of action." *Williams v. French*, 146 F.3d 203, 212 (4th Cir.1998), *cert. denied*, 525 U.S. 1155, 119 S.Ct. 1061, 143 L.Ed.2d 66 (1999); *see Burket v. Angelone*, 208 F.3d 172 (4th Cir.), *cert. denied*, 530 U.S. 1283, 120 S.Ct. 2761, 147 L.Ed.2d 1022 (2000) (No. 99–9917). A court accords "great weight" to a lawyer's perception of a "conflict" when evaluating a conflicts claim. *See United States v. Young*, 644 F.2d 1008 (4th Cir.1981).

Petitioner attempts to show prejudice or adverse effect in five ways. Petitioner first contends that trial counsel did not investigate and impeach Wilson regarding his financial motive to testify against petitioner. Petitioner is referring to the reward money which was being offered for information in the Poore case. Counsel questioned Wilson extensively during trial regarding his motivation for testifying against petitioner. He attempted to get Wilson to admit that he was testifying in hopes of personal gain rather than for totally unselfish reasons. (Trial Tr. Vol. V, at 624) At the time of the trial, there were no agreements with regard to the reward money as found by the state motion for appropriate relief court. (Order on Motion for Appropriate Relief, at 24, ¶ 25) And, Wilson had not received the $2,500 that he would receive from the Governor's reward offer. Petitioner fails to cite any specific method of investigation which counsel could have followed which would likely have resulted in the discovery of Wilson's purported financial motivation. Moreover, there is no showing that Gillespie's prior representation of Wilson hindered this aspect of cross-examination or that there was ever a divergence of interests with regard to it.

Petitioner next claims that trial counsel did not properly prepare to cross-examine Wilson. Specifically, petitioner attacks counsel's failure to go to the jail and speak to Wilson prior to his testimony. However, there is no showing that counsel's decision not to visit Wilson in jail was due to Gillespie's prior representation of Wilson. Moreover, with the exception of a calendar Wilson kept which will be discussed later, there is no showing of any specific information that such an interview would have revealed.

Petitioner's next contention is that trial counsel did not properly cross-examine Wilson about his lengthy criminal record. Petitioner concedes that counsel apparently had a copy of Wilson's record while cross-examining him. But petitioner says that counsel should have had the case files of Wilson's prior convictions in the courtroom so that he could have impeached Wilson with the records if he denied the convictions. However, the cross-examination on Wilson's criminal record was extensive. It successfully placed before the jury that Wilson had been convicted three times for breaking and entering, thirty-six times for forgery and uttering, for probation violations, for possession of cocaine, for misdemeanor escape from jail, for assault on a female, and for driving offenses. (Trial Tr. Vol. V, at 618–22) Petitioner

*pending rehearing en banc* (Oct. 23, 2000). Because the trial court in petitioner's case had no knowledge of the alleged conflict and should not have reasonably known of it, this situation is not presented in petitioner's case. Therefore, if the trial court has no duty to

inquire as in petitioner's case, under *Cuyler v. Sullivan* he must make the adverse effect showing notwithstanding the fact that full disclosure of the effects of the conflict was not made to him. *See* 446 U.S. at 348, 100 S.Ct. 1708.

cites no convictions which Wilson denied that he could have been impeached on by use of the files of his cases. There is no showing of either an effect on counsel's cross-examination resulting from the potential conflict or a divergence of interests.

Petitioner next attempts to show some adverse effect by pointing out that counsel made no effort to obtain a calendar that Wilson testified he kept while in jail. Wilson testified that in this calendar he made notations about petitioner's confession to him. (Order on Motion for Appropriate Relief, at 25, ¶ 29) Petitioner contends that the calendar could possibly have been used to impeach Wilson at trial. However, the state court hearing petitioner's motion for appropriate relief found that the calendar would have corroborated Wilson's trial testimony. (*Id.* at 15, ¶ 39) The court also found that the calendar was not favorable to petitioner, that counsel would not have wanted the calendar introduced into evidence, and that no reasonable probability exists that disclosure of the calendar would have changed the result at trial.[6] (*Id.* at 28, ¶ 44; at 15, ¶ 40) Petitioner has not shown any divergence of interests regarding this calendar and has not shown an adverse effect on counsel's performance due to any potential conflict.

 Next, petitioner contends that trial counsel failed to aggressively cross-examine Wilson about his history of drug abuse. Counsel did cross-examine Wilson regarding his abuse of drugs, and as a result Wilson admitted that he had been convicted of possession of cocaine and that he was a cocaine addict. (Trial Tr. Vol. V, at 625) Wilson also admitted that he was involved in an undercover drug deal by which he sought to get revenge on some-

one who had "crossed" him. (*Id.* at 630) Petitioner argues that counsel "should have cross-examined Wilson about the fact that he frequented bars and drug houses." (Petitioner's Br. at 35) However, such revelations would have added little to the information that the jury already knew about Wilson. Petitioner fails to show that any more aggressive cross-examination would have resulted in any more damaging information on Wilson's drug history. In addition, there is no showing that counsel's purportedly mild cross-examination was due in any way to Gillespie's prior representation of Wilson.

Finally, petitioner contends that trial counsel failed to interview friends and associates of Wilson so that witnesses could have been presented at trial to show Wilson's poor reputation in the community for credibility. Petitioner fails to name any specific individuals who would have testified and fails to proffer any testimony that they would have given. *See Bassette v. Thompson,* 915 F.2d 932, 940–41 (4th Cir. 1990) (requiring proffer of testimony from witnesses to establish ineffective assistance). As noted previously, the jurors knew that Wilson was a drug addict and a convicted felon several times over. It is very unlikely that they were under the impression that Wilson enjoyed a high reputation for credibility in the community. Petitioner has failed to make a showing of a divergence of interest or an adverse effect resulting from the prior representation.

In considering all of these arguments by petitioner, he has failed to show any divergence of his interests from those of his attorneys in the cross-examination of Wilson.[7] This Court, therefore, finds that no

---

6. The calendar was lost before the time of the post-conviction evidentiary hearing.

7. Petitioner relies upon two cases in arguing that a conflict existed which this Court finds unpersuasive due to the different factual situations presented. In *Hoffman v. Leeke,* 903

actual conflict existed. *See Williams,* 146 F.3d at 212. Moreover, even if petitioner had established an actual conflict, there is no showing that the purported actual conflict adversely affected his lawyer's performance. *See Cuyler v. Sullivan,* 446 U.S. at 348, 100 S.Ct. 1708.

The state court's denial of relief based upon petitioner's claim of attorney conflict of interest was not contrary to federal law nor did it involve an unreasonable application of federal law. Petitioner's second ground for relief should be dismissed. *See* 28 U.S.C. § 2254(d).

### Ground III–Failure to submit mitigating circumstance

Petitioner contends in his third claim that the trial court violated his Eighth and Fourteenth Amendment rights by refusing to submit a statutory mitigating circumstance to the jury. *See Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The circumstance at issue is that petitioner committed the murder while under the influence of a mental or emotional disturbance. Petitioner contends that the jury was not allowed to consider that he had been smoking marijuana and drinking alcohol prior to the crime, and suffered from a mixed personality disorder and a substance abuse disorder. Respondent notes that voluntary intoxication by drugs or alcohol at the time of the offense does not qualify as a mental or emotional disturbance under North Carolina's death penalty statute. *See State v. Irwin,* 304 N.C. 93, 106, 282 S.E.2d 439 (1981).

The Supreme Court of North Carolina considered this claim on direct appeal. The court held that the trial court did not err in refusing to submit to the jury this mitigating circumstance because petitioner had not submitted sufficient evidence to support his contention that he was under a mental or emotional disturbance at the time of the murder. *See Chandler,* 342 N.C. at 756–57, 467 S.E.2d 636.

The Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *See Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

In petitioner's case, the jury was not prevented from considering any of the evidence petitioner relies upon in this claim. The jury simply was not given an instruction on the specific mitigating circumstance that petitioner desired.[8] However, the jury was instructed to consider several similar mitigating circumstances. One such submitted circumstance was whether petitioner's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. Petitioner argued in connection with this circumstance that his alcohol use affected his judgment as supported by the testimony of Dr. Warren. (Trial Tr. Vol. VIII, at 1032–33). In addition, petitioner submitted the circumstance that he had a

---

F.2d 280 (4th Cir.1990), the attorney advised one client to give a statement and testify to the essential elements of a crime allegedly committed by a second client. The conflict in that case was apparent. Also, in *United States v. Williams,* 81 F.3d 1321 (4th Cir.1996), the court found no abuse of discretion by the trial court in disqualifying counsel for the husband who was the same attorney who, as of about a year earlier, had represented the wife who

would be a significant witness for the government with respect to the same crime.

8. To the extent petitioner may be claiming that there was sufficient evidence to support the statutory mitigating construction, he fails to show that the decision of the North Carolina Supreme Court was both wrong and a violation of his constitutional rights.

history of alcohol and drug abuse which led him to make poor choices in his life. He argued in connection with this circumstance that such abuse was a factor in his entering Mrs. Poore's home on the evening of the murder. (*Id.* at 1035) Finally, the court submitted a "catch-all" circumstance to the jury. This mitigating circumstance allowed the jury to consider "any circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value." (*Id.* at 1038–39)

Because the jury was free to consider as a mitigating factor all of the evidence raised by petitioner, this Court finds no violation of petitioner's Eighth or Fourteenth Amendment rights. This Court cannot find that the Supreme Court of North Carolina's decision was contrary to federal law or involved an unreasonable application of federal law. Petitioner's third ground for relief should be dismissed. *See* 28 U.S.C. § 2254(d).

***Claim IV–Restrictive definition of mitigation***

Petitioner's final claim is that the trial court erred by giving the jury an improperly restrictive definition of mitigation. He claims this instruction violated his Eighth and Fourteenth Amendment rights. *See Lockett,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973. The instruction was as follows:

> Now, a mitigating circumstance is a fact or a group of facts which do not constitute a justification or excuse for a killing, or reduce it to a lesser degree of crime than first degree murder, but which may be considered as extenuating or reducing the moral culpability of the killing, or making it less deserving of extreme punishment than other first degree murders.
>
> Our law identifies several possible mitigating circumstances. However, in considering Issue No. 2 it would be your duty to consider as mitigating circumstances any aspect of the defendant's character or record or any of the circumstances of this murder that the defendant contends is a basis for a sentence less than death, and any other circumstances arising from the evidence which you, the jury, deem to have mitigating value.

(Trial Tr. Vol. VIII, at 1071–72)

Petitioner cites only the first paragraph of the instruction quoted above and argues that it focuses exclusively on the facts of the crime itself without regard for the individual circumstances of the petitioner, in violation of *Lockett.*

The Supreme Court of North Carolina addressed this issue on direct appeal as a preservation issue and declined to depart from its prior holding. *See Chandler,* 342 N.C. at 759–60, 467 S.E.2d 636.

The standard for determining whether the jury instruction passes constitutional muster is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *See Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). A reviewing court evaluates the instruction with a common-sense understanding of the instructions in light of all that has taken place at the trial. *See Johnson v. Texas,* 509 U.S. 350, 368, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993).

Petitioner specifically cites his youth, immaturity, and impairment at the time of the crime and contends that these instructions permitted the jury to ignore such evidence. However, the instruction read in its entirety allows and specifically invites the jury to consider the individual circumstances of the petitioner when determining what mitigating circumstances are present. The first mitigating circum-

stance that petitioner argued to the jury was his age at the time of the murder. (Trial Tr. Vol. III, at 1030) Also, as mentioned earlier, petitioner argued to the jury both that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired and that his history of alcohol and drug abuse had mitigating value. (Trial Tr. Vol. VIII, at 1032–35) There is no reasonable likelihood that the jury misinterpreted the challenged instruction and ignored this evidence as a result.

This Court finds no violation of federal law with respect to petitioner's final ground for relief. Accordingly, petitioner's final ground should be dismissed. *See* 28 U.S.C. § 2254(d).

**IT IS THEREFORE RECOMMENDED** that the habeas corpus petition of Frank Ray Chandler be denied and that this action be dismissed.

June 12, 2001.