UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FRANK RAY CHANDLER,
          *Petitioner-Appellant,*

v.

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
          *Respondent-Appellee.*

No. 03-6

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., Chief District Judge.
(CA-99-668-1)

Argued: October 28, 2003

Decided: March 5, 2004

Before WILKINS, Chief Judge, and WIDENER and
SHEDD, Circuit Judges.

_____

Affirmed by unpublished opinion. Chief Judge Wilkins wrote the opinion, in which Judge Widener and Judge Shedd joined.

_____

## COUNSEL

**ARGUED:** S. Mark Rabil, Assistant Capital Defender, Winston-Salem, North Carolina; John Clark Fischer, RANDOLPH & FISCHER, Winston-Salem, North Carolina, for Appellant. Valerie Blanche Spalding, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for

Appellee. **ON BRIEF:** Roy Cooper, Attorney General of North Carolina, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

WILKINS, Chief Judge:

Frank Ray Chandler appeals an order of the district court denying his petition for a writ of habeas corpus, *see* 28 U.S.C.A. § 2254 (West 1994 & Supp. 2003), in which he challenged his conviction and death sentence for the murder of 90-year-old Doris Poore.[1] Finding no error, we affirm.

## I.

Poore's body was found on the morning of December 11, 1992. She was lying on her bed with a pool of blood underneath and around her head. Although a sheet had been pulled over Poore, her pajama top was open and she was naked from the waist down; her underwear and pajama bottoms were wadded together near her feet. There were smeared bloody fingerprints on her abdomen. A subsequent autopsy revealed that Poore was killed by a single, massive blow to the head.

At trial, Chandler was linked to the crime by circumstantial evidence. Chandler's palm and fingerprints were found on the door leading into Poore's kitchen. Chandler's cousin, with whom Chandler spent the night of December 10-11, testified that Chandler had left the house for a time late at night; subsequently, Chandler asked his cousin not to tell anyone he had left the house.

---

[1]Chandler named R. C. Lee, Warden of Central Prison in Raleigh, North Carolina, as Respondent. We refer to Respondent as "the State."

The prosecution also presented the testimony of Jeffrey Kyle Wilson, who was Chandler's cellmate for several months following Chandler's arrest. Wilson testified that Chandler described the murder to him. According to Wilson, Chandler stated that he broke into the house and encountered Poore in the kitchen. He struck her on the head and, not realizing that he had killed her, laid her on the bed. When Wilson asked Chandler why Poore was naked from the waist down (information he had learned from the newspaper), Chandler responded that "he had never seen no old p***y." Trial Tr., Vol. V, at 614. On direct and cross-examination, Wilson repeatedly denied having sought or been offered any benefit in exchange for his testimony, despite the fact that he had several pending charges. Wilson did acknowledge that one of the investigating officers appeared on his behalf at a parole revocation hearing that took place four days after Wilson's initial contact with police regarding Chandler. Wilson's parole was nevertheless revoked.

Chandler testified in his own defense, claiming that he broke into Poore's house because he believed he could find marijuana there. After knocking on a window, the garage door, and the back door, Chandler entered the house through the basement door and proceeded upstairs to the kitchen. Chandler testified that he saw something out of the corner of his eye and had turned to leave when someone behind him screamed. He swung his left arm as he turned around, striking Poore, who fell against him. Chandler stated that he carried Poore to her bed and then went into the bathroom to wash his hands; he found Poore's pajama bottoms and underwear near the toilet and placed them in the bed with her before he left.

A jury convicted Chandler of first-degree murder, first-degree burglary, and attempted larceny.[2] Following a capital sentencing hearing, the jury recommended, and the trial judge imposed, a sentence of death for the murder conviction. The convictions and sentence were affirmed on direct appeal. *See State v. Chandler*, 467 S.E.2d 636 (N.C.), *cert. denied*, 519 U.S. 875 (1996). As is relevant here, the North Carolina Supreme Court rejected Chandler's claim that the trial

---

[2]The jury acquitted Chandler of attempted first-degree rape and attempted first-degree sexual offense.

court erred in refusing to submit a particular statutory mitigating circumstance to the jury. *See id.* at 644-45.

Chandler thereafter filed a motion for appropriate relief (MAR), which was assigned to the same judge who had presided over Chandler's trial. Chandler claimed, *inter alia*, that (1) the prosecution had knowingly allowed Wilson to testify falsely, (2) the prosecution failed to disclose evidence that would have impeached Wilson's testimony, and (3) one of his attorneys had previously represented Wilson, and thus was laboring under a conflict of interest in violation of Chandler's Sixth Amendment rights. After conducting a hearing that included the presentation of evidence, the MAR court denied relief.

Chandler filed this federal habeas action on August 12, 1999, raising the claims described above and one additional claim. The matter was referred to a magistrate judge, who recommended that the petition be dismissed. After considering Chandler's objections to the magistrate judge's recommendation, the district court denied relief. *See Chandler v. French*, 252 F. Supp. 2d 219, 224 (M.D.N.C. 2003) (adopting recommendations of magistrate judge). We subsequently granted a certificate of appealability, *see* 28 U.S.C.A. § 2253(c) (West Supp. 2003); 4th Cir. R. 22(a), as to the following issues: (1) whether the prosecution knowingly allowed Wilson to testify falsely; (2) whether the prosecution withheld exculpatory evidence concerning Wilson's testimony; (3) whether an actual conflict of interest adversely affected the performance of one of Chandler's attorneys; and (4) whether the refusal to submit a particular mitigating circumstance to the jury violated Chandler's constitutional rights.[3]

Because Chandler's claims were adjudicated on their merits by the state courts of North Carolina, our review is limited to determining whether the decision of that court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C.A. § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent in either of two situations: (1) when "the state court applies a rule that contradicts

---

[3]We denied a certificate of appealability as to Chandler's claim that the trial court provided the jury an unconstitutionally restrictive definition of mitigating evidence.

the governing law set forth in [Supreme Court] cases," or (2) when "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision rests on an "unreasonable application" of clearly established Supreme Court precedent when "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

## II.

Chandler raises two claims related to Wilson's testimony. First, he maintains that the prosecution knowingly allowed Wilson to testify falsely regarding his motives for testifying against Chandler. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). Second, Chandler claims that the prosecution failed to produce several items of evidence that would have allowed him to impeach Wilson's testimony. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). We deny relief as to both of these claims.

### A. *Facts*

As noted previously, defense counsel cross-examined Wilson at some length concerning his motivation for testifying against Chandler. In response to these questions, Wilson repeatedly denied having asked for lenience with respect to his pending charges. *See, e.g.*, Trial Tr. Vol. V. at 623 ("I never brought my charges up, never."); *see also id.* at 611 (direct examination) ("I ain't asked these people [the prosecution] for personal gain whatsoever. I never brung [up] my charges . . . in any of our conversations."). Additionally, on direct and cross-examination Wilson denied having been promised any benefit in exchange for his testimony. Wilson did acknowledge, however, that one of the investigating officers, Special Agent Ron Perry, had appeared at Wilson's parole revocation hearing and informed the Parole Board that Wilson had provided information regarding the Poore murder.

In support of his *Napue* and *Brady* claims, Chandler points to a number of items of evidence that were not disclosed by the prosecu-

tion. Three of these items are relevant to both claims: a question—
"What's in it for me?" J.A. 200 (internal quotation marks omitted)—
Wilson asked before giving his initial statement to law enforcement
officers; and two police reports resulting from the initial interview of
Wilson, both of which listed Wilson's pending charges. The other
items of evidence relate only to the *Brady* claim and are listed there.

### B.   *Napue Claim*

A conviction acquired through the knowing use of perjured testi-
mony by the prosecution violates due process. *See Napue*, 360 U.S.
at 269. This is true regardless of whether the prosecution solicited tes-
timony it knew to be false or simply allowed such testimony to pass
uncorrected. *See Giglio v. United States*, 405 U.S. 150, 153 (1972);
*Napue*, 360 U.S. at 269. The Supreme Court has held that a defendant
is entitled to relief on such a claim when "'there is any reasonable
likelihood that the false testimony could have affected the judgment
of the jury.'"[4] *Kyles v. Whitley*, 514 U.S. 419, 433 n.7 (1995) (quoting
*United States v. Agurs*, 427 U.S. 97, 103 (1976)).

In his MAR, Chandler claimed that Wilson expected favorable
treatment on his pending charges in exchange for testifying against
Chandler and that the prosecution knowingly allowed him to testify
to the contrary. The MAR court rejected this claim on the merits. For
the reasons set forth below, we conclude that the ruling of the MAR
court is entitled to deference under § 2254(d).

The MAR court made a factual finding that after Wilson asked
"What's in it for me?" Special Agent Perry informed him that while
the officers were interested in hearing what Wilson had to say regard-
ing Chandler's involvement in the Poore murder, they could not offer
him any deals and did not want the information if it was contingent
on their providing some kind of benefit to Wilson. The MAR court
further found that the District Attorney admonished Wilson that no
sentencing concessions would be offered in exchange for Wilson's

---

[4]Other courts have held that a habeas petitioner alleging a *Napue* viola-
tion cannot obtain relief without also satisfying the harmless error stan-
dard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See, e.g.*,
*Mitchell v. Gibson*, 262 F.3d 1036, 1062 n.13 (10th Cir. 2001).

testimony against Chandler. Based on these and other findings, the MAR court determined that there was never any kind of agreement, express or implied, that Wilson would testify in exchange for concessions on his pending charges.

Chandler does not dispute these factual findings. *See* 28 U.S.C.A. § 2254(d)(2). Rather, he maintains that the MAR court misapplied the law by assuming that Wilson's testimony could be false for purposes of a due process violation only if there was an agreement between Wilson and the prosecution. *See* J.A. 356-57 (opinion of MAR court) ("Since no agreement existed, implied or express, the State did not present perjured testimony through Wilson when he testified that he had not brought up his pending charges in expectation of a sentencing concession. *Giglio* does not apply to [Chandler's] claim."). Chandler notes that the Due Process Clause prohibits the prosecution from knowingly presenting *any* false testimony, not just false denials of an agreement between a witness and the prosecution. *See, e.g.*, *Alcorta v. Texas*, 355 U.S. 28, 31-32 (1957) (per curiam) (holding that the prosecution violated the defendant's due process rights by knowingly allowing a prosecution witness to testify falsely regarding the nature of his relationship with the victim). Chandler claims that even if no agreement existed, Wilson nevertheless testified falsely when he claimed that he never brought up his charges.

Chandler overlooks the fact that the MAR court made factual findings that are fatal even to this narrower claim. Specifically, the MAR court found that Wilson's denial of having brought up his charges referred to his discussions with the District Attorney, during which his pending charges were not mentioned. With respect to the list of charges in the police reports, the MAR court found that Wilson identified his pending charges in response to a question from Special Agent Perry toward the end of the interview; the discussion of pending charges was not initiated by Wilson.

These factual findings are entitled to deference from this court. *See* 28 U.S.C.A. § 2254(d)(2), (e)(1).[5] In light of these findings, Wilson's

---

[5]Section 2254 contains two provisions relevant to the evaluation, on federal habeas, of state-court factual determinations. First, § 2254(d)(2)

testimony that he did not initiate a discussion of his pending charges is not false. Therefore, there was no due process violation.

## C.   *Brady Claim*

Suppression by the government of evidence favorable to the defense that is material to the outcome of a trial or sentencing proceeding violates due process, irrespective of the good or bad faith of the prosecutor. *See Brady*, 373 U.S. at 87. In addition to the disclosure of materially exculpatory evidence, due process requires the government to disclose material evidence affecting the credibility of prosecution witnesses. *See Giglio*, 405 U.S. at 154-55. Undisclosed evidence is material when its cumulative effect is such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34 (internal quotation marks omitted); *see id.* at 436 (explaining that "suppressed evidence [must be] considered collectively, not item by item"). A "reasonable probability" is one sufficient to undermine confidence in the outcome. *See id.* at 434.[6]

With this standard in mind, we examine each of the items of evidence that Chandler claims should have been disclosed to him. For the reasons set forth below, we conclude that Chandler is not entitled to relief.

---

provides that a district court may not grant habeas relief unless the adjudication of a claim by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Second, § 2254(e)(1) provides that factual findings by the state court are presumed to be correct and that the petitioner bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." We need not here determine the contours of the relationship between § 2254(d)(2) and § 2254(e)(1), because Chandler cannot show either that the state court findings were unreasonable in light of the evidence presented or that they were incorrect.

[6]Some of Chandler's *Brady* claims were not addressed by the MAR court. To the extent Chandler's claims were not adjudicated on the merits, we conduct de novo review. *See Fullwood v. Lee*, 290 F.3d 663, 692 (4th Cir. 2002), *cert. denied*, 537 U.S. 1120 (2003).

### 1.  *"What's in it for me?"*

Chandler maintains that the prosecution was obligated to disclose that Wilson had asked "What's in it for me?" at the outset of his interview concerning the Poore murder because the question demonstrates that Wilson's motives for testifying against Chandler were purely selfish.[7] We agree with the magistrate judge's assessment that in light of the thorough cross-examination of Wilson and the fact that there was no deal for Wilson's testimony, this question was of limited impeachment value and hence was not material. Therefore, the failure to disclose the statement did not violate Chandler's due process rights.

### 2.  *Police Reports*

As noted previously, two reports were generated following Wilson's interview with law enforcement officers. One of these—written by Special Agent Perry and submitted to the State Bureau of Investigation—contained statements that, according to Chandler, establish that Wilson initiated a discussion of his pending charges. *See, e.g.*, J.A. 320 ("Wilson advised that he was currently incarcerated . . . [on] four charges of forgery."). Chandler claims that the State was obligated to disclose these reports because they contradict Wilson's claim that he did not bring up his charges.

Special Agent Perry testified, and the MAR court found, that Wilson identified the charges pending against him in response to a question asked by Perry. In view of this finding, the police reports would not have been useful in impeaching Wilson's testimony. Therefore, the failure to disclose them did not violate Chandler's constitutional rights.

### 3.  *Attendance at Parole Revocation Hearing*

Four days after Wilson's initial contact with law enforcement officers concerning the Poore murder, Special Agent Perry appeared at

---

[7]The MAR court concluded that the question did not tend to demonstrate that Wilson's testimony was false, but did not specifically rule concerning the obligation of the prosecution to disclose the fact that Wilson had asked the question.

Wilson's parole revocation hearing and informed the parole board that Wilson had provided information concerning the case. Following his appearance, Special Agent Perry wrote a report that was included in the District Attorney's files for the prosecution of Chandler. During a pretrial hearing, the District Attorney informed the court that

> an individual . . . who may be a witness in this case . . . ask-[ed] that he be given some consideration before the parole board. That individual, the relief prayed for was not granted by the parole board. But the state did, through its agents go to the parole board and ask that it be done.

Tr. of Motions Hearing, Apr. 19, 1993, at 14. At trial, Special Agent Perry testified that he had appeared before the parole board and had informed the board that Wilson had provided information related to the Poore murder. And, Wilson testified that he had asked Special Agent Perry to appear at the hearing and that he hoped Perry's appearance would benefit him.

Chandler maintains that the State violated *Brady* by failing to disclose the report because its existence—and the fact that it was placed in the District Attorney's files for the prosecution of Chandler— "shows that Agent Perry regarded his attendance at the parole hearing for Mr. Wilson as part of his duties for the Chandler case." Prelim. Br. of Petitioner-Appellant Frank Ray Chandler at 44 [hereinafter Appellant's Br.]. Therefore, Chandler maintains, the report had "impeachment value as to the motivations and expectations of Mr. Wilson." *Id.*

We conclude that the failure to disclose the report did not violate Chandler's constitutional rights.[8] All of the information found in the report concerning Special Agent Perry's appearance before the parole board was revealed at trial through Perry's own testimony. And, the fact that the report was placed in the Chandler prosecution file is not material in light of Perry's testimony that he informed the parole

---

[8]The MAR court did not specifically address Chandler's *Brady* challenge to the failure to disclose the report; we therefore consider the matter de novo.

board that Wilson had provided information concerning Poore's murder.

Chandler also maintains that the report should have been disclosed because it indicated that the sheriff of Surry County—where Wilson's forgery charges were pending—attended the hearing. Chandler argues that the sheriff's presence at the hearing created in Wilson an expectation that he would receive assistance on those charges in exchange for his testimony. There is absolutely no evidence supporting the existence of such an expectation, however. And, the mere fact that the sheriff was present at a parole revocation hearing conducted within his own jail does not, alone or in conjunction with the other suppressed evidence, create a reasonable probability that the jury would have either rejected Wilson's testimony or reached a different conclusion regarding Chandler's guilt.

### 4.  *Reward Money*

Following Chandler's conviction, Wilson received half of a $5,000 reward offered by the Governor of North Carolina for information related to Poore's murder. The reward was publicized by a proclamation, which stated in relevant part that "the payment of this reward or any portion thereof is conditional upon the information being furnished as a direct result of the issuance of this proclamation." J.A. 247. Chandler argues that the State had a duty to provide the proclamation to defense counsel "because it was express evidence of an inducement for Mr. Wilson to embellish or fabricate his testimony."[9] Appellant's Br. at 45-46.

The proclamation is a public document that could have been discovered by Chandler's counsel through the exercise of reasonable diligence. Therefore, the State was under no duty to disclose the proclamation. *See United States v. Kelly*, 35 F.3d 929, 937 (4th Cir. 1994).

---

[9]Because the MAR court did not address this claim, we conduct de novo review.

### 5.  *Sentence in Police Report*

One of the police reports written after Wilson's interview with law enforcement officers contained the sentence, "Chandler never said that he touched or fondled [Poore] in any way." J.A. 327. The MAR court found that the sentence was properly interpreted to mean that Chandler had never said anything one way or the other about fondling Poore. Based on this finding, the court concluded that the State's failure to disclose the statement did not violate Chandler's due process rights. In light of the factual finding by the MAR court—which Chandler fails to rebut—this ruling is entitled to deference under § 2254(d)(1).[10]

### 6.  *Lab Report*

During Chandler's trial, both the prosecution and the defense were in possession of a letter purportedly written by Wilson.[11] The letter stated that Wilson had never spoken to a district attorney or the court concerning Chandler, that Wilson would not testify at trial, and that, if questioned, Wilson would say that he lied "concerning pending charges." J.A. 330. A lab report dated July 13, 1993—during Chandler's trial—stated that there was sufficient similarity between the letter and known samples of Wilson's writing "to warrant a degree of belief" that Wilson wrote the letter. *Id.* at 329 (emphasis omitted). Wilson denied writing the letter both prior to trial and during the MAR hearing. Chandler did not attempt to make any use of the letter during trial. The MAR court rejected Chandler's *Brady* claim regarding the nondisclosure of the report, concluding that the report did not have significant impeachment value.

Chandler maintains that the State should have turned over the lab report because its disclosure could have prompted defense counsel to obtain further analysis which might have connected Wilson to the let-

---

[10]Chandler argues that the interpretation of the sentence was a matter for the trial jury. Even if this is so, the interpretation of the statement by the MAR court amounts to a predictive judgment regarding how a reasonable jury would construe the statement.

[11]The provenance of the letter and how it came to be in the parties' files are mysteries.

ter more conclusively. *See Maynard v. Dixon*, 943 F.2d 407, 418 (4th Cir. 1991). Even if this is so, Chandler has failed to demonstrate prejudice because there is no evidence that further analysis would have conclusively established Wilson as the author of the note. Additionally, it is questionable whether such analysis would be admissible to impeach a denial of authorship by Wilson. *See* N.C. R. Evid. 608(b) ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, . . . may not be proved by extrinsic evidence."); *United States v. Westmoreland*, 312 F.3d 302, 311 n.5 (7th Cir. 2002) (noting that the admission of expert testimony corroborating a witness' denial of writing a letter violated Federal Rule of Evidence 608(b)), *cert. denied*, 123 S. Ct. 2094 (2003). We therefore conclude that the rejection of this claim by the MAR court is entitled to deference under § 2254(d)(1).

## III.

In 1988, one of Chandler's attorneys, James Gillespie, represented Wilson on forgery charges that were resolved by negotiated plea. During jury selection in Chandler's case, Gillespie learned that Wilson would be a witness for the prosecution. Gillespie informed Chandler and cocounsel Terry Collins of his prior representation of Wilson, but because he did not believe that any conflict of interest existed, he did not ask Chandler to execute a waiver and did not inform the trial court that he had represented Wilson.

Gillespie did not recall the specifics of his representation of Wilson and could not recall any confidential information he received in the course of the attorney-client relationship with Wilson. Collins cross-examined Wilson. Gillespie could not recall why Collins conducted the cross-examination but stated that he thought Collins was the better cross-examiner. Gillespie did not believe that his prior representation of Wilson was a factor.

Chandler maintained in his MAR that his Sixth Amendment right to the assistance of counsel was violated by Gillespie's prior representation of Wilson. The MAR court rejected this claim on the merits, concluding that while a possible conflict of interest existed, it did not ripen into an actual conflict. Furthermore, the court determined that Gillespie's prior representation of Wilson did not adversely affect his

performance as Chandler's attorney. We conclude that this ruling was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel, a right which includes entitlement to representation that is free from conflicts of interest. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Wood v. Georgia*, 450 U.S. 261, 271 (1981). "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). "[A] mere theoretical division of loyalties" is insufficient. *Mickens v. Taylor*, 535 U.S. 162, 171 (2002); *see Cuyler*, 446 U.S. at 350 (holding "that the *possibility* of conflict is insufficient to impugn a criminal conviction" (emphasis added)). When such a showing is made, prejudice is presumed and the defendant is entitled to reversal of his conviction. *See Cuyler*, 446 U.S. at 349-50.[12]

Courts have identified several factors pertinent to the determination of whether successive representation has given rise to an actual conflict of interest. For example, courts have considered (1) whether "the current and former cases are substantially related," *Belmontes v. Woodford*, 350 F.3d 861, 885 (9th Cir. 2003); *see Perillo v. Johnson*, 205 F.3d 775, 798 (5th Cir. 2000); *Freund v. Butterworth*, 165 F.3d 839, 859 (11th Cir. 1999) (en banc); (2) whether the attorney has obtained confidential information from the client, *see Belmontes*, 350 F.3d at 885; *Perillo*, 205 F.3d at 798; *Freund*, 165 F.3d at 859; *see also United States v. Agosto*, 675 F.2d 965, 971 (8th Cir. 1982) (explaining that having confidential information about a former client who is a witness against a current client may adversely affect an attorney's performance by tempting the attorney to use the confidential information during cross-examination or by hindering the attorney

---

[12]The Supreme Court has expressly left open the question of whether it is appropriate to presume prejudice in a case, like this one, in which a conflict is alleged to arise from successive representation. *See Mickens*, 535 U.S. at 176. Because, as explained below, Chandler has failed to demonstrate the existence of an actual conflict of interest that adversely affected his lawyers' performance, we need not consider this question.

from conducting a vigorous cross-examination for fear of revealing confidential information); (3) the temporal relationship between the prior and successive representations, particularly whether the prior representation was "unambiguously terminated" before the successive representation commenced, *Perillo*, 205 F.3d at 798; and (4) whether the attorney has a "pecuniary interest in possible future business" from the former client, *Agosto*, 675 F.2d at 971. Regardless of which of these factors (if any) may be relevant to a particular instance of successive representation, the ultimate question is "whether counsel's allegiance to the accused was compromised by competing obligations owed to other clients." *Perillo*, 205 F.3d at 798; *see Belmontes*, 350 F.3d at 885.

We agree with the MAR court that while Gillespie's prior representation of Wilson created a *potential* conflict of interest, there was never an *actual* conflict. Gillespie's representation of Wilson was on a matter wholly unrelated to the charges against Wilson, and that representation had unambiguously terminated well before Gillespie was appointed to represent Chandler—indeed, even before Poore was murdered. Critically, while Gillespie acknowledged that he had probably met with Wilson and likely received some confidential information from his client, he could not recall any specifics of the representation or the content of any information obtained. And, there is no evidence that Gillespie hoped or expected to represent Wilson in the future.

We further agree with the MAR court that even assuming the existence of an actual conflict—and assuming a showing of prejudice would be required, *see supra* note 12—Chandler failed to demonstrate an adverse effect on counsel's performance. In the first place, Collins performed a thorough cross-examination of Wilson, questioning Wilson regarding his prior convictions, his history of drug abuse, and his motivation for testifying against Chandler. Chandler maintains, however, that counsel (1) did not question Wilson regarding his financial motives for testifying against Chandler, (2) did not interview Wilson prior to his testimony, (3) did not have a copy of Wilson's criminal record in the courtroom during cross examination, (4) did not attempt to obtain Wilson's calendar,[13] and (5) did not adequately cross-examine Wilson regarding his drug use.

---

[13]Wilson testified that he kept a calendar on which he noted significant events in his life and that he had noted his conversations with Chandler

As the magistrate judge explained, *see Chandler*, 252 F. Supp. 2d at 248-50, it is not at all clear that counsel's performance was inadequate in the respects alleged by Chandler. Chandler's claim of adverse effect fails because there is no evidence in the record to support a finding that any of these alleged failings resulted from Gillespie's prior representation of Wilson. We therefore affirm the denial of relief on this claim.

### IV.

On direct appeal, Chandler argued that the trial court erred in refusing to instruct the jury to consider the statutory mitigating circumstance that "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance." N.C. Gen. Stat. § 15A-2000(f)(2) (2001). Chandler maintained that submission of this circumstance to the jury was supported by evidence that he had been drinking alcohol on the night of the murder, that he had a history of substance abuse, and that he suffered from mixed personality disorder. The North Carolina Supreme Court determined that this evidence did not support the instruction, *see Chandler*, 467 S.E.2d at 644-45, a ruling that Chandler does not challenge. He nevertheless maintains that the refusal of the trial court to give the requested instruction violated his constitutional rights by limiting the jury's consideration of mitigating evidence.[14]

A jury shall "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis omitted). However, the Constitution does not dictate the *manner* in which a jury considers and gives effect to mitigating evidence; all that is required is that the state "not pre-

---

on the calendar. The MAR court made a factual finding that had defense counsel obtained the calendar, it would have corroborated Wilson's testimony.

[14]Having determined that Chandler was not entitled to the instruction as a matter of state law, the North Carolina Supreme Court did not address Chandler's constitutional claim.

clude the jury from giving effect to any relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998).

There was no constitutional violation here. All of the mitigating evidence proffered by Chandler was presented to the jury. And, the instructions given by the trial court not only did not preclude the jury from considering this evidence; they actually provided at least three avenues for giving effect to it: the statutory mitigating circumstance that Chandler's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired," N.C. Gen. Stat. § 15A-2000(f)(6) (2001); the nonstatutory mitigating circumstance that Chandler's history of substance abuse had led him to make poor choices in his life; and the statutory "catch-all" mitigating circumstance, *see* N.C. Gen. Stat. § 15A-2000(f)(9) (2001) (allowing the jury to consider "[a]ny other circumstance arising from the evidence which the jury deems to have mitigating value"). We therefore affirm the denial of relief on this claim.

## V.

For the reasons set forth above, we conclude that the district court correctly denied Chandler's petition for a writ of habeas corpus. We therefore affirm.

*AFFIRMED*